No. 57,229

HOLLY ENERGY, INC., *Appellant*, v. R. J. PATRICK, d/b/a R. J. PATRICK OPERATING COMPANY, *et al.*, *Appellees*.

(722 P.2d 1073)

Opinion filed July 18, 1986.

*R. Doak Bishop, Jr.*, of Hughes & Luce, of Dallas, Texas, argued the cause and *Thomas W. Luce, III* and *John J. Little*, of the same firm, and *Donald R. Newkirk*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, were with him on the brief for appellant.

*Charles W. Harris*, of Curfman, Harris, Stallings & Snow, of Wichita, argued the cause and *Steven J. Rupp*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: Holly Energy, Inc., (hereinafter Holly) appeals from an adverse judgment in an action involving the construction and interpretation to be given an oil and gas lease farmout agreement between Holly and the defendant R. J. Patrick d/b/a R. J. Patrick Operating Co. (hereinafter Patrick). The farmout agreement involves two quarter sections of land in Comanche County. Appellees are three investors who purchased working interests from Patrick in oil and gas leases on the two properties. The appellee Continental Illinois National Bank & Trust Company of Chicago is the mortgagee of one of the investors. Four-

teen other investors and Patrick have effected a settlement with Holly and are not involved in this appeal.

The facts are complicated and will be set forth in detail. For convenience in understanding the facts, the following map of the area in litigation is reproduced.

R. J. PATRICK OPERATING COMPANY          12/7/82

SECTION 35-33-20          SECTION 36-33-20

| | |
|---|---|
| Dual Oil Well ⦿ Robert Wimmer 4 | Oil Well ● Robert Wimmer 3 |
| Dual Oil & Gas Well ✳ Robert Wimmer 1 | Oil Well ● Robert Wimmer 2 |

Ralph Baker 2 Dry Hole

| | |
|---|---|
| Dual Oil Well ⦿ 2 Ora Baker | Dry Hole ✧ 4 Ora Baker |
| Dual Oil Well ⦿ Ora Baker 3 | Oil Well ● Ora Baker 1 |

Dual Oil & Gas Well ✳ Ralph Baker 1     Dry Hole ✧ Ralph Baker 3

Dry Hole ✧ Wesley Girk 1          Dry Hole ✧ Wesley Girk 2

SECTION 2-34-20          SECTION 1-34-20

COMANCHE COUNTY, KANSAS

Beginning in 1977 Holly, a foreign corporation, with its principal place of business in Dallas, Texas, sought to obtain oil and gas leases on extensive acreage in southwest Kansas. Among leases purchased by Holly in 1978 were the Wimmer lease covering the east one-half of Section 35, Township 33 South, Range 20 West, and the Ora Baker lease covering the northeast quarter and the

east one-half of the northwest quarter of Section 2, Township 34 South, Range 20 West, both in Comanche County. The eighty acres comprising the east one-half of the northwest quarter of Section 2 has been referred to throughout this litigation as the Baker Trust property or tract. The northeast quarter of Section 35 included in the Wimmer lease is not involved in this appeal and further references to the Wimmer lease or tract will apply only to the southeast quarter. Patrick held several leases in the area including 320 acres, referred to as the Ralph Baker lease, adjoining the Wimmer and Ora Baker tracts on the east. The Wimmer and Ora Baker tracts are those directly involved in this action and are the subject matter of the farmout agreement. The three leases were considered as being located in wildcat territory with the nearest proven production nearly one mile away.

In 1980 Patrick desired to drill on the Ralph Baker lease. In order to make such exploration economically feasible, he sought support from other lessees in the area. In April 1980 Patrick contacted Holly about the possibility of obtaining a farmout agreement on all or part of the Wimmer and Ora Baker leases and was advised to make a written proposal. Holly evidently was not interested in drilling its own wildcat acreage at that time. On April 28, 1980, Patrick wrote Holly about the Ora Baker lease advising that he owned the lease on the Ralph Baker property to the east. He indicated he wanted to drill on that lease and stated in his letter:

"The wells in this area are being drilled on 40 acre spacing. I would like to make a deal for alternating 40's *or perhaps a farm-out on all your acreage on an override basis.*" (Emphasis added.)

Patrick's initial proposal was not acceptable to Holly although the parties continued negotiations. On July 8, 1980, Patrick submitted another proposal suggesting a 1/16th overriding royalty on oil and ⅛th on gas with Patrick receiving the leases on 320 acres in return for drilling one well. Several telephone calls followed and on July 30, 1980, Holly submitted its own proposal which was accepted by Patrick on August 2, 1980. That agreement led to this lawsuit. The agreement, prepared by Holly and addressed to Patrick, stated in part:

"Re: 4205 - SE/4 Sec. 35, T33S, R20W
      4308 - NE/4 Sec. 2, T34S, R20W
      Comanche County, Kansas

"Gentlemen:

"1. Subject to the terms, conditions, and provisions of this agreement, Holly Energy, Inc., hereinafter referred to as First Party, agrees to transfer to you an undivided interest in the *captioned lands* as covered by the above captioned Oil and Gas Leases.

"2. You shall have the option to commence or cause to be commenced, on or before 90 days from the date hereof, the actual drilling of *a well* for production of oil and gas at a location of your choice *on either of the captioned quarter sections,* and to diligently prosecute the drilling of same to completion or abandonment.

"3. In the event you timely commence, drill and complete *the well* provided for in Paragraph 2 hereof as a well producing oil or gas in paying quantities in compliance with the provisions of this agreement, then, and in such event, First Party agrees to execute and deliver to you a recordable assignment of the oil and gas rights of First Party *in that portion of the captioned quarter section situated within the production unit established for that well* producing oil or gas in paying quantities, . . . and subject to an overriding royalty interest reserved in favor of First Party of 22.5%, which reserved interest includes all royalty, overriding royalty, and other burdens on production presently affecting the interest assigned in said leases.

"4. Further, in the event you timely commence, drill, and complete the well provided for in Paragraph 2 hereof, you shall have the option to commence or cause to be commenced, on or before 60 days from the release of the rig from the said well drilled pursuant to Paragraph 2 hereof, the actual drilling of *a well* for production of oil and gas at a location *on the remaining captioned undrilled quarter section,* and to diligently prosecute the drilling of same to completion or abandonment.

"5. In the event you timely commence, drill, and complete *the well* provided for in Paragraph 4 hereof as a well producing oil or gas in paying quantities in compliance with the provisions of this agreement, then, and in such event, First Party agrees to execute and deliver to you a recordable assignment of the oil and gas rights of First Party *in that portion of the captioned quarter section situated within the production unit established for that well* producing oil or gas in paying quantities, . . . and subject to an overriding royalty interest reserved in favor of First Party of 22.5%, which reserved interest includes all royalty, overriding royalty, and other burdens on production presently affecting the interest assigned in said leases." (Emphasis added.)

Paragraph 9 pertains to the release or surrender of the Holly leases by Patrick and states in part:

"If you should at any time desire to surrender any of said leases as to all or any portion of the above described lands . . . ."

Paragraph 14 states:

"Upon your [Patrick's] written request, made within 180 days of completion of a test well earning specific acreages, First Party [Holly] shall execute and deliver a conveyance of such earned Oil and Gas Leases or leasehold estates."

Other provisions of the agreement referred to "either well,"

"said well," "any well," "all wells," "each well," "well or wells," "any wells" and "a well" in various contexts which appellees contend compound what they assert are ambiguities in the sections of the agreement quoted above.

Following the execution of the farmout agreement, Patrick undertook the drilling of a well on his Ralph Baker lease which was dually completed October 25, 1980, as a producing oil and gas well. Having been successful with the Ralph Baker well, Patrick then commenced the Ora Baker #1 well under the terms of the farmout agreement with Holly. Holly was aware of the location of the well in the center of the southeast quarter of the northeast quarter of the section and was furnished daily drilling reports and other pertinent information. On December 31, 1980, the well was completed as an oil producer and on January 15, 1981, Patrick formally notified Holly of the successful completion of the well and further stated:

"This is our written request as required in our farmout agreement, asking you to assign the Northeast ¼ of Section 2-34-20 to me as agreed."

Holly responded on January 26, 1981, sending an executed assignment of its oil and gas lease as to the entire quarter section stating:

"Enclosed is an Assignment of Interest earned by your drilling and completing the above captioned well."

The assignment reserved Holly's overriding royalty interest as provided for in the farmout agreement and specifically provided that the assignment was subject to all of the terms of the farmout agreement.

During this general period of time Patrick sold several interests to various investors and, after receiving the assignment of the lease from Holly, assigned those interests to the investors. As previously indicated, most of the investors settled their differences with Holly and are not involved in this appeal.

Patrick's next step was to drill and complete the Wimmer 1 well in the southwest quarter of the southeast quarter of that leased property. The well was dually completed March 31, 1981, as both an oil and gas well. On May 7, 1981, Patrick reported the completion to Holly and Holly then executed an assignment of its Wimmer lease to Patrick, reserving its overriding royalty interest and providing that the assignment was subject to the

farmout agreement. Patrick then drilled the Ralph Baker #2 well and when it turned out to be a dry hole he determined he would proceed to develop the Ora Baker and Wimmer leases by drilling additional wells on a forty-acre spacing pattern. Patrick contacted Holly about his proposed location for the Ora Baker #2 well and thereafter he was advised by Holly that he had no right to drill more than one well on each of the leases. Holly then proceeded to develop the Baker Trust property and completed two oil and gas wells on that eighty-acre tract. Patrick attempted to reach some agreement with Holly over the future development of the Ora Baker and Wimmer leases but was unable to do so. Patrick then proceeded to develop the leases on a forty-acre spacing pattern as promulgated by the proration orders of the Kansas Corporation Commission and as generally accepted in the area. He drilled three additional wells on each lease with all of them except the Ora Baker #4 being successful.

Holly filed suit against Patrick and his investors on March 18, 1982, shortly after the last well was completed by Patrick, asserting: (1) breach of contract; (2) misrepresentation and fraud; (3) mutual mistake justifying rescission of the contract; (4) unilateral mistake justifying reformation and rescission of the contract; (5) trespass and conversion; and (6) a claim for injunctive relief. The defendants set forth numerous defenses and counterclaimed against Holly seeking to quiet their title to the Ora Baker and Wimmer leases and in addition seeking actual and punitive damages on a variety of theories. Following lengthy discovery and trial, encompassing thousands of pages of depositions and transcripts and approximately 300 exhibits, the trial court filed exhaustive findings and conclusions consisting of seventy findings of fact and sixteen conclusions of law covering thirty legal sized pages. The court found generally for the defendants and against the plaintiffs, quieting the defendants' title to the Wimmer and Ora Baker leases and denying all other relief sought by the parties.

Holly has appealed raising six issues, contending:

1) The trial court erred when it failed to find that the farmout agreement was unambiguous and allowed Patrick to drill no more than one well on each quarter section and to earn an assignment of only the acreage attributable to that well;

2) the trial court erred when it failed to interpret the

farmout agreement in a manner which gave effect to the language of the agreement and was consistent with the parol evidence submitted concerning the meaning of its provisions and the intent of the parties;

3) the trial court erred when it failed to hold that Patrick had breached the farmout agreement;

4) the trial court erred when it failed to hold that the partial assignments of the oil and gas leases were subject to and incorporated the provisions of the farmout agreement;

5) the trial court erred when it failed to rescind or reform the farmout agreement and the assignments based upon the parties' mutual mistake regarding the nature and terms of those agreements; and

6) certain of the trial court's findings of fact are irrelevant, unsupported by the record, and should be stricken.

The first issue, whether the trial court erred when it concluded the contract was ambiguous and allowed Patrick to drill more than one well, and the second issue, whether the trial court failed to give effect to the language of the contract, both involve the trial court's construction of the farmout agreement and will be considered together.

At the outset it should be noted that when a dispute arises over the terms of an agreement, a number of well settled rules of law apply. Whether an ambiguity exists in a written instrument is a question of law to be decided by the court. *Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 508 P.2d 889 (1973). Language in a contract is "ambiguous" only when words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings. *Havens v. Safeway Stores,* 235 Kan. 226, 678 P.2d 625 (1984). In construing a written instrument the language used anywhere in the instrument should be taken into consideration and construed in harmony with all other provisions. *Heyen v. Hartnett,* 235 Kan. 117, 679 P.2d 1152 (1984). The document must be construed from its four corners and all provisions must be considered together and not in isolation. *Barnhart v. McKinney,* 235 Kan. 511, 682 P.2d 112 (1984). When an ambiguity appears in a contract or document, the language is construed against the party who prepared the instrument. *State v. Downey,* 198 Kan. 564, 426 P.2d 55 (1967).

Appellant asserts that the language in paragraphs two and five of the farmout agreement to the effect that, upon completion of a well on a quarter section, Patrick will be entitled to an assignment of the oil and gas rights "in that portion of the captioned quarter section situated within the production unit established for that well" is clear and unambiguous in that the term *production unit* has a well defined meaning. Holly asserts the agreement contemplated that Patrick would be allowed to drill one well on a quarter section and if successful would receive an assignment of the oil and gas lease only to the extent of the forty acres attributable to the initial well. In such case Holly would retain the lease as to the remaining one hundred twenty acres. Patrick, on the other hand, contends the term *production unit* as used in the agreement had no meaning to him, was not a generally accepted and understood term, and that it was his understanding from the beginning that if production was obtained he would receive an assignment of the lease on the full quarter section and develop it on a forty-acre spacing pattern. The trial court made findings of fact far more extensive and detailed than set forth in this opinion. It found the farmout agreement ambiguous and in doing so stated, *inter alia*:

"46. An analysis of the farmout agreement, which was marked Plaintiff's Exhibit 1, reflects no express limitation on Patrick's right to drill additional wells on either of the quarter sections concerned. At the outset, the document is referenced to the full quarter sections. In the first paragraph Holly agrees to transfer to    Patrick an undivided interest in the captioned lands as covered by the above-captioned Oil and Gas Leases, subject to terms of agreement and there is no use of the word "limited". The Oil and Gas Leases cover the entire quarter section referenced.

"47. It is in paragraph 3 of the farmout agreement that Holly contends the limitation on Holly's right to drill is stated. It is in that paragraph 3 that the ambiguity becomes apparent where Holly agrees to execute and deliver a recordable assignment of its Oil and Gas right 'in that portion of the captioned quarter section situated within the production unit established for that well producing oil or gas in paying quantities' and ·this grant includes further limitations not here material.

. . . .

"49. Paragraph 4 of the farmout agreement grants Patrick the right to drill on the remaining quarter if he successfully completes the well on the first quarter entitling him to commence drilling a second well within 60 days of completion of the first well. Paragraph 5 contains the identical language to paragraph 3, which Holly contends restricts Patrick's rights to only 40 acres of each quarter section. Under the terms contained in paragraph 5, Holly is obligated to assign oil or gas rights to Patrick in the quarter section should oil or gas be discovered in paying quantities.

"50. While paragraph 8 speaks to the contingency of an unsuccessful attempt to obtain production from *either* well, paragraph 10 further contributes to the ambiguity by addressing the contingency of Patrick's failure to plug *any* well. Paragraph 12 obligates Patrick to provide all drilling reports and full information relative to *all* wells as opposed to 'either or both' wells. Paragraph 13 refers to the above-mentioned well or wells. Paragraph 14 uses the phrase *well or wells.* Paragraph 16 speaks in terms of *any of the aforementioned wells.*

"51. This ambiguity could have been avoided had Mr. Celey [the Holly draftsman] used the term *either of the wells* in a consistent manner throughout all paragraphs of the farmout agreement. . . .

"52. Holly, then, further compounded the confusion by executing the requested assignments granting to Patrick all Holly's rights in the full quarter sections in question."

While we may not agree with all of the reasoning of the trial court as set forth above and in other portions of its findings, we do agree that the farmout agreement is ambiguous and subject to construction. Well-known experts testified as to the meaning of the term "production unit" both in the abstract and in the context of the farmout agreement. Needless to say, the experts were not in agreement as to the meaning of the term as used here. There was substantial competent evidence to support the trial court's findings that the language of the farmout agreement did not limit Patrick to drilling only one well on each quarter section and did not limit the acreage he was entitled to receive to forty acres. If the parties' intent had been otherwise, it would have been a simple matter for Holly to clearly state in the farmout agreement that only one well was contemplated and that, if successful, Patrick would receive an assignment as to forty acres only. The evidence is abundant that Holly was, or should have been, fully aware from the time of Patrick's initial letter that development on a forty-acre spacing pattern was contemplated. Information to the effect that was the generally accepted practice in the area was readily available. Holly is not some novice operator but, to the contrary, is an experienced oil and gas producer operating in several states. However, in spite of the extensive record indicating Holly had knowledge of the forty-acre spacing pattern, it prepared, executed, and delivered to Patrick absolute assignments of each quarter section. It is true the assignments were subject to the farmout agreement but it appears clear that at the time of the execution of the assignments Holly evidently construed and intended the farmout agreement to provide for as-

signment of the leases on the full quarter sections. There was evidence that under a factual situation, as presented in this case, no prudent operator would have accepted a farmout from Holly which covered only forty acres from each lease. As we have said many times:

"Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law." *City of Council Grove v. Ossmann*, 219 Kan. 120, 546 P.2d 1399 (1976).

Appellant argues that even if the farmout agreement was correctly found to be ambiguous, the trial court erred in allowing parol evidence to disregard the terms of the agreement. Considerable evidence was introduced as to various meanings which may be ascribed to the term "production unit" based upon its use in a particular factual setting. The evidence attributed various meanings to the term as used in the agreement, including testimony it had no definable meaning. Appellant appears to contend that only the evidence which supports its interpretation of the agreement should be considered and that any evidence negating its alleged intent should not be considered. That is not the law. Having determined the agreement to be ambiguous, the trial court did not err in admitting parol evidence as to the meaning or lack thereof of certain terms in the agreement. When the farmout agreement and assignments of the oil and gas leases are read and construed together in their entirety, we have no hesitancy in finding that the trial court's findings and conclusions are supported by substantial competent evidence. Appellant's first two points lack merit.

Appellant's next point is that the trial court erred in its failure to find that Patrick had breached the farmout agreement. This issue is controlled by the result reached on the first two issues. Having determined that the trial court did not commit error in its construction and application of the farmout agreement, there is no error in not finding a breach of contract by Patrick.

The fourth point is that the trial court erred in failing to hold that the oil and gas lease assignments were subject to the farmout agreement. Appellant zeroes in on finding 65 which states:

"65. The assignments of 160 acre leasehold interests from Holly to Patrick on January 23, 1981, and May 18, 1981, are found to be clear and unambiguous and controlling in this case, as a matter of fact and of law,"

and implies that we should ignore the balance of the findings and the record in this case. This entire lawsuit was based upon the farmout agreement and to say that the court did not consider the assignments to be subject to the farmout agreement is to ignore the other findings and consider finding 65 totally out of context.

Next, it is asserted the trial court committed error in not granting rescission or reformation of the farmout agreement based upon the doctrine of mutual mistake. Again appellant concentrates primarily upon an isolated statement by the trial court concerning Holly's burden of proof. While the conclusions of law indicate there may have been some confusion and commingling of the legal principles relating to Holly's claim of fraud and misrepresentation and its claim of mutual mistake, when the record, findings of fact, and conclusions of law are considered together, we find no reversible error.

Lastly, appellant asserts error in what it contends were findings unsupported by the record. Appellant then attacks only finding 42. Assuming that particular finding is not supported in toto by the record, the striking of this particular finding would not affect the outcome of this case. Under this same point of error, appellant again rehashes some evidence favorable to it and claims error in the court's failure to find Patrick was limited to one well and forty acres on each lease. Nothing new is asserted that was not covered elsewhere. Finally under this point, appellant contends it was unduly limited in its examination of its expert witnesses and that it was not given the same leeway that appellees enjoyed. The admission of expert testimony lies within the sound discretion of the trial court. *Long v. Deere & Co.*, 238 Kan. 766, 715 P.2d 1023 (1986). While the trial court's ruling was somewhat restrictive, we cannot say that the court abused its discretion or that such prejudice has been shown as would constitute reversible error. *City of Ottawa v. Heathman*, 236 Kan. 417, 690 P.2d 1375 (1984).

As indicated earlier, this was a long trial with voluminous discovery, exhibits, and testimony. All parties were ably represented by experienced counsel and the issues and evidence were fully presented to the court. Once it was determined as a matter of law that the farmout agreement was ambiguous, the case became principally a fact case. The facts from both per-

spectives were fully developed and presented. Appellant, as may be expected, dwells heavily on the evidence supporting its positions. However, there was equally credible evidence supporting the appellees' positions and in such a case we cannot reverse the trial court on a fact issue. Our review of the record convinces us that the decision reached by the trial court must be affirmed.

The judgment is affirmed.