IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,699

JENNIFER HARDING and SAMANTHA RAMIREZ,
Individually and on Behalf of All
Others Similarly Situated,
*Appellants*,

v.

CAPITOL FEDERAL SAVINGS BANK,
*Appellee.*

SYLLABUS BY THE COURT

If, after applying the pertinent rules of interpretation to the face of a contract, a court remains genuinely uncertain about which one of two or more meanings is the proper meaning, the court must construe the contract against the drafter.

Review of the judgment of the Court of Appeals in 65 Kan. App. 2d 30, 556 P.3d 910 (2024). Appeal from Shawnee District Court; MERLIN G. WHEELER, judge. Oral argument held September 8, 2025. Opinion filed October 17, 2025. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and the case is remanded.

*David G. Seeley*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause, and *Lyndon W. Vix*, of the same firm, was with him on the briefs for appellants.

*Kersten L. Holzhueter*, of Spencer Fane LLP, of Kansas City, Missouri, argued the cause, and *Bryant T. Lamer*, of the same firm, was with her on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: Plaintiffs Jennifer Harding and Samantha Ramirez have checking accounts with Capitol Federal Savings Bank (Capitol Federal). They brought a class action lawsuit against Capitol Federal based on overdraft fees charged to their accounts. Harding sued based on Capitol Federal's alleged practice of charging overdraft fees on "Authorize Positive Purportedly Settle Negative" (APPSN) transactions. These transactions occur when a transaction does not result in an overdraft at the time the transaction was authorized, but

> "'settlement of a subsequent unrelated transaction that further lowered the customer's available balance . . . pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement . . . the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.'"

For example, if a person with $5 in their account purchases a $4 coffee in the morning, the account will not go into overdraft immediately. But if that person then buys lunch for $10 in the afternoon, and the lunch purchase is settled with the bank first, the account will go into overdraft status resulting in an overdraft fee. So far so good. If, however, the $4 coffee purchase does not settle until the following day, the account already being in overdraft status, a second overdraft fee will be charged by Capitol Federal. It is this second fee that Harding challenges as a breach of contract—and she seeks to represent a class of similarly situated Capitol Federal customers.

Ramirez, on the other hand, sued based on multiple overdraft fees charged against a single transaction. She attempted a single payment to AT&T for $164.87. Defendant returned payment due to insufficient funds, then reprocessed the transaction two

2

additional times, and ultimately charged Ramirez three overdraft fees for a single transaction. Ramirez similarly alleges that this practice is a breach of contract—and she also seeks to represent a class of similarly situated Capitol Federal customers.

The underlying contractual dispute in this class action suit, however, is not before us. The contract between Capitol Federal and plaintiffs was attached to the amended petition. And Capitol Federal sought to dismiss the action based, for our purposes, on the following notice provision found in Part IV, Section G of that contract:

> "[I]f your account statement contains any errors or improper charges, you agree to notify us of any such errors or improper charges within 30 days of the date on which we mailed or otherwise made the affected statement available to you. If you do not notify us within that time, you are barred from bringing any action against us that is in any way related to the errors or improper charges."

The district court held a hearing on the motion to dismiss and questioned plaintiffs' counsel about the notice provision. Counsel acknowledged that plaintiffs had not given notice within 30 days, but counsel nevertheless argued that the notice provision did not apply to bank overdraft fees. The district court ultimately granted the motion based on the "very clear Notice Provision." The court reasoned the phrase "'improper charge'" needed "to be viewed from the perspective of the account holder. . . . [I]f you think there's something improper on your monthly statement you have to bring it to the attention of the bank before . . . alleg[ing] that the bank breached its obligations to you." And "since the plaintiff has conceded that they did nothing to bring the alleged violations of the contract to the attention of the defendant, then in my view, that provision of the contract has been violated."

At the Court of Appeals, plaintiffs argued (1) that the district court erred in holding that the notice provision applied, (2) the notice provision is unenforceable,

3

(3) the district court erred in considering matters outside the pleading at the motion to dismiss phase (that is, counsel's "admissions" that no notice was given), and (4) the district court erred in refusing to allow leave to amend.

The panel reversed the district court. It first noted that the "appeal turns on whether the district court correctly interpreted the term 'improper charges' as meant under [plaintiffs'] Account Agreement with Capitol Federal when granting the bank's motion to dismiss." *Harding v. Capitol Federal Savings Bank*, 65 Kan. App. 2d 30, 43, 556 P.3d 910 (2024). After summarizing the parties' arguments, it held that "the district court violated the law controlling when to grant a motion to dismiss and how to construe contracts." 65 Kan. App. 2d at 46. Specifically, the panel ruled that "whether contractual performance depends on a condition precedent constitutes a question of fact." 65 Kan. App. 2d at 47. And in this case, "the condition precedent within Section G's notice provision is whether a consumer's 'statement contains any errors or improper charges.'" 65 Kan. App. 2d at 47. Therefore,

> "unless the Account Agreement clearly and unambiguously explained that APPSN and NSF fees were improper charges, the district court should have denied Capitol Federal's motion to dismiss because plaintiffs' amended petition alleged that they had performed all their required obligations under the Account Agreement before suing Capitol Federal under the specific facts of their breach of contract claims." 65 Kan. App. 2d at 47-48.

In so holding, the panel went on to note that

> "to the extent that plaintiffs' arguments involve either the district court or Capitol Federal raising matters outside the pleadings, those arguments are not properly before this court. Plaintiffs' counsel's failure to object to the district court's questioning and concession that Capitol Federal had not relied on matters outside the pleadings to support its motion to dismiss amounts to invited error." 65 Kan. App. 2d at 48.

But the panel nevertheless still held for plaintiffs because they "correctly argue that the term 'improper charges' as explained in the Account Agreement is ambiguous." 65 Kan. App. 2d at 48. Ultimately,

> "when evaluating whether plaintiffs had to comply with the condition precedent to timely notify Capitol Federal of improper charges listed on their account statements as required under Section G's Account Agreement's 30-day notice provision, this determination would have obviously involved a question of fact. . . . Then, the district court erred when it engaged in fact-finding at the motion to dismiss hearing." 65 Kan. App. 2d at 53.

The panel did not explain why or how its improper fact-finding holding was relevant in light of its holding that the key contractual term—"improper charges"—was ambiguous.

We granted Capitol Federal's petition for review and plaintiffs' conditional cross-petition for review.

ANALYSIS

"Whether a district court erred by granting a motion to dismiss for failure to state a claim is a question of law subject to unlimited review." *Jayhawk Racing Properties v. City of Topeka*, 313 Kan. 149, 154, 484 P.3d 250 (2021). We exercise unlimited review over the interpretation and legal effect of written instruments, including whether a written instrument is ambiguous, and are not bound by the lower court's interpretations or rulings. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

As we will explain below, we agree with the Court of Appeals that the contractual term "improper charges" is ambiguous. But we must go a step further and actually construe the meaning of the term—and of the clause in which it is found—to fully resolve the issue before us. In so doing, because we arrive at a construction of the contract that does not require notice by customers to Capitol Federal of contested

5

overdraft fees, we need not address whether the district court improperly found facts outside the pleadings—which was, ultimately, the issue relied upon by the panel to reach its conclusions. In other words, following our legal conclusion, the factual question of whether notice was given becomes irrelevant.

Turning now to the crucial legal question of ambiguity and, ultimately, of meaning, Capitol Federal argues the Court of Appeals erred in finding the phrase "improper charges" is ambiguous. Instead, Capitol Federal argues its plain meaning clearly includes the very overdraft fees at issue in this lawsuit. For their part, plaintiffs argue that the Court of Appeals correctly held that the notice provision was ambiguous and properly strictly construed the provision against Capitol Federal as the drafter of the contract. Plaintiffs particularly emphasize "[u]nder the maxim of *expressio unius est exc*[*l*]*usio alterius*, the failure of the notice provision to mention bank fees is, in and of itself, a compelling indicator that bank fees were not intended to be encompassed by that provision."

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). Moreover, "'interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners.'" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). But "[a]mbiguous language in a written instrument will be strictly construed against the drafter of the document." *Botkin v. Security State Bank*, 281 Kan. 243, Syl. ¶ 7, 130 P.3d 92 (2006).

"'To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its

language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.

"'Whether a written instrument is ambiguous is a question of law to be decided by the courts.'" *Geer v. Eby*, 309 Kan. 182, 192-93, 432 P.3d 1001 (2019).

Here, the district court held that "the term 'improper charges' is unambiguous because the words 'improper' and 'charge' are broad enough to include any charge that the consumer believes he or she should not be charged with." *Harding*, 65 Kan. App. 2d at 49. But the panel held that this inappropriately isolated a single sentence or provision in the contract. 65 Kan. App. 2d at 49. Examining the entire section, the panel reasoned:

"Nothing within the plain language of Section G addresses bank fees. So, in context, the plain language of the notice provision tells a consumer that if the consumer believes that his or her statement shows an improper charge, like a forgery or alteration, that consumer must notify Capitol Federal of the apparent errors or improper charges." 65 Kan. App. 2d at 50.

The bank's argument is not without merit. Looking at other portions of the contract, a "charge" can refer to fees from the bank itself. For example, a few paragraphs before the notice provision, in Part IV, Section E, the contract states:

"You agree to pay us, or have us deduct from your account, such fees and service charges as we may, from time to time, impose pursuant to this Agreement or the terms of the deposit account. You are liable for any account deficit resulting from fees and service charges, whether caused by you or another person authorized to withdraw from your account, together with the costs we incur to collect that deficit, including our reasonable attorneys' fees. Your account is subject to the current fees and service charges as shown in the separate fee schedule or schedules that apply to your account, which are incorporated into this Agreement by reference."

The attached "fee schedule" referenced above is a document titled "Personal Service Charge Schedule" and includes the fees that plaintiffs challenge.

Reading the notice provision itself, however, it is not at all clear that "improper charges" includes "bank fees." The context within the notice provision itself is actually focused on forgeries and alterations and is clearly concerned with fraudulent activity on a customer's account. That is, it is talking about a disputed "charge" made by a third party against the balance in a customer's account. It is confusing at best to conflate this with a "charge" made by the bank against the customer for services rendered (such as covering an overdraft). Thus, the question for the court is whether "improper charges" refers globally to two very different kinds of charges—unauthorized third-party activity *and* bank fees—or third-party activity alone.

Under the interpretive canon, *noscitur a sociis*, the meaning of a word or phrase may be known from accompanying words. When we look at the context of the notice provision, the type of improper charges that require notice would be those *akin* to forgeries and alterations, such as fraudulent use of a bank card. This makes good sense in a contractual provision that requires *notice*. A *customer* is in the best position to know, after reviewing a bank statement, whether there have been unauthorized third-party charges against the account. On the other hand, the *bank* is in the best position to know whether fees charged are proper or not. Why would a bank require notice of fees it charges its own customers for services rendered—the bank clearly already believes those fees are authorized. The purpose of the notice provision itself cuts against Capitol Federal's interpretation and, at a minimum, lends persuasive weight to the proposition that the clause is ambiguous.

Moreover, "[i]n construing a written instrument the language used anywhere in the instrument should be taken into consideration and construed in harmony with all other provisions." *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, 534, 722 P.2d 1073 (1986).

8

Looking at the entirety of the contract, there is evidence that the term "charge" can exclude institutional fees. In Part V, Section E, the contract discusses exchange rates in the following manner: "If you effect a transaction with your True Blue® Direct Visa® card in a currency other than U.S. dollars, Visa® will convert the charge into a U.S. dollar amount and Visa® will impose its then-current currency exchange fee (see separate fee schedule(s))." Here, a consumer transaction is synonymous with a "charge," which is subject to a separate exchange "fee."

Similarly, there are uses of the word "charge" (or variations of the term) as a verb in connection with a transaction initiated by an account user and carried out by the bank, rather than a fee initiated by the bank itself. For example, in Part IV, Section F, the contract states:

> "We may charge your account on the day that a check or other transaction is presented (or returned) to us for payment. We may also charge your account or place a hold on funds at an earlier time if we receive notice than an item or transaction has been deposited for collection in another institution or is being processed against your account by a merchant (for example, at a point-of-sale terminal)."

And Part IV, Section K states: "You authorize us to honor electronic debits against your account resulting from electronic check conversions. . . . If one of your paper checks is converted, it will be collected electronically and charged against your account much more quickly than a paper check." The logical extrapolation when viewing the notice provision in conjunction with these portions of the contract is that an *improper* charge in the notice provision is a *transaction*, albeit one initiated in an *unauthorized* manner.

In Capitol Federal's favor, however, when "charge" is used as a noun in the contract, it generally refers to activity done by the bank. For instance, in Part IV, Section

9

K's subsection on Stop Payments states, "At your request, we may stop payment on a check drawn against your account, as applicable, provided you meet our conditions to effect such a request, subject to a service charge." The truth is that after applying all the tools of contractual interpretation, there remains bona fide evidence for both plaintiffs' and Capitol Federal's preferred interpretations. We need not resolve this conflict on the basis of some definitive plain meaning—we need only weigh this uncertainty as a point in favor of ambiguity.

Thus, after examining the entirety of the contract, we are convinced there are two types of "charges":  (1) those charged and initiated by the bank against a customer as a "fee" for services rendered; and (2) those from third parties (authorized and unauthorized) withdrawing money from a customer's account. Having examined the contract as a whole and after applying the pertinent rules of interpretation to its face, we remain genuinely uncertain about which of the meanings are intended to apply. *Geer*, 309 Kan. at 192. See also *Waste Connections*, 296 Kan. at 966 ("[T]he Asset Purchase Agreement was ambiguous on this point. Reasonable people could—and have—read it to set a transfer station price of either $2 million or $1.45 million."); *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, Syl. ¶ 5, 179 P.3d 1104 (2008) ("Because the policy at issue in this case does not define the term 'occurrence' and the cases from various courts demonstrate that the term 'occurrence' is susceptible to conflicting meanings, the term is ambiguous."); *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 578-83, 56 P.3d 789 (2002) (finding a coverage limitation provision ambiguous after some provisions supported a $40,000 per loss interpretation and one provision supported a $40,000 limitation for all losses sustained within the policy period); *Holly Energy*, 239 Kan. at 534 ("[A] contract is 'ambiguous' only when words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings."). Cf. *Fawcett Trust v. Oil Producers Inc. of Kansas*, 315 Kan. 259, 290, 507 P.3d 1124 (2022) ("[P]arty [asserting equitable estoppel] will not prevail when the facts are ambiguous or subject to multiple constructions.").

10

When a court properly finds a contract to be ambiguous, the court must construe that ambiguity against the drafter. See *Botkin*, 281 Kan. 243, Syl. ¶ 7. Our task, at this point, becomes simple. The ambiguity inherent in the contested phrase "improper charges" must be construed against Capitol Federal to exclude the fees the bank itself imposes upon its own customers. Thus, as a matter of law, the notice provision does not apply to overdraft fees. Having reached this legal conclusion, the remaining issues raised in the petition and cross-petition for review are moot.

The judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed, and this case is remanded.

ROSEN, J., not participating.