No. 102,598

THOROUGHBRED ASSOCIATES, L.L.C., *et al.*, *Appellants/Cross-appellees*, v. KANSAS CITY ROYALTY COMPANY, L.L.C.; ROBERT E. THOMAS REVOCABLE TRUST; and D.D.H., L.L.C., *Appellees/Cross-appellants*.

(308 P.3d 1238)

1194

Opinion filed September 20, 2013.

*Jeff Kennedy*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Marcia A. Wood*, of the same firm, and *David J. Rebein*, of Rebein Bangerter, P.A., of Dodge City, were with him on the briefs for appellants/cross-appellees.

*William J. Skepnek*, of The Skepnek Law Firm P.A., of Lawrence, argued the cause, and *David E. Pepper* and *Michael J. Novotny*, of Hartzog Conger Cason & Neville, of Oklahoma City, Oklahoma, were with him on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

BILES, J.: This is an oil and gas lease dispute regarding: (1) whether tracts of land could be unitized; (2) if so, what minerals were unitized; and (3) alleged drainage of the leased lands. The district court disposed of the first two questions by summary judgment and the drainage claim after a bench trial. Both parties appealed to the Court of Appeals, which affirmed the district court. *Thoroughbred Assocs. v. Kansas City Royalty, Co.*, 45 Kan. App. 2d 312, 248 P.3d 758 (2011). We disagree in part with both lower courts and reverse the summary judgment orders.

We hold the lease unambiguously sets out conditions precedent for unitization and there are no disputed material facts as to whether those prerequisites were met based on the parties' summary judgment briefs and supporting materials. But this holding does not end the case. We remand to the district court for further proceedings because disputed facts exist regarding alternative claims that have not yet been addressed—and which may need to be considered—depending on how the district court disposes of other issues. We agree the drainage claim was not proven and affirm that ruling.

## FACTUAL AND PROCEDURAL HISTORY

In 1998, Thoroughbred Associates, L.L.C., drilled a prolific gas well, known as the Bird Well, in Comanche County, Kansas. Thoroughbred then began targeting other land near the Bird Well, resulting in the acquisition of leases and creation of a unit called the Thoroughbred-Rietzke Unit (Rietzke Unit). Thoroughbred is the lead plaintiff in this case. The other plaintiffs hold oil and gas interests in the Rietzke Unit. Collectively, the plaintiffs dispute whether the defendants properly belong in the Rietzke Unit.

OXY USA, Inc. owned an undivided one-third interest in the oil, gas, and other minerals underlying a tract in Comanche County near the Bird Well. In July 1998, Thoroughbred entered into an oil and gas lease with OXY for that tract. An OXY employee drafted the lease (the OXY Lease) from preprinted forms. It was recorded in August of that year. About 2 months after the OXY Lease took effect, Thoroughbred filed a "Declaration of Unitization of Oil and Gas Leases" with the Comanche County Register of Deeds, com-

bining the OXY Lease and numerous other leases into the 640-acre Rietzke Unit. The defendants Kansas City Royalty Company, L.L.C.; Robert E. Thomas Revocable Trust; and D.D.H., L.L.C. (collectively referred to as Kansas City Royalty) later purchased OXY's interest and became successors-in-interest to the OXY Lease.

Thoroughbred drilled several wells on the Rietzke Unit, which produced both oil and gas in varying quantities, although none were located on the land subject to the OXY Lease. But all of the wells on the Rietzke Unit qualified for what is known in the industry as a full allowable, which becomes relevant to the parties' dispute whether the OXY Lease could have been unitized. An "allowable" is "[t]he amount of oil or gas which a well, leasehold, field, pipeline system or state is permitted to produce under proration orders of a state conservation commission." 8 Williams & Meyers, Oil and Gas Law, Manual of Oil and Gas Terms, p. 40 (2012). In Kansas, state regulation provides a full allowable if: "(1) Location exceptions have been granted for manmade structures or topographic features; (2) No interference with drainage of adjacent wells can be shown by competent evidence; or (3) Actual interference is less than the reduced allowable." K.A.R. 82-3-312(f).

Once Kansas City Royalty had acquired the OXY Lease, it began inquiring whether Thoroughbred's Bird Well was draining minerals from the adjacent Rietzke Unit. The parties disagreed about what information Kansas City Royalty could receive to investigate the drainage issue and whether the Bird Well was actually draining the Rietzke Unit. Those disagreements preceded this litigation.

Thoroughbred initially submitted royalty payments accruing from the Rietzke Unit, which Kansas City Royalty accepted; but Thoroughbred stopped these payments as tensions increased. Thoroughbred soon argued the OXY Lease's terms actually prohibited Thoroughbred from including that lease's lands within the Rietzke Unit. In other words, Thoroughbred contended it had mistakenly unitized the OXY Lease lands as part of the Rietzke Unit.

### The OXY Lease and Declaration of Unitization

Under its terms, the OXY Lease was to remain in effect for 1 year "and as long thereafter as oil or gas, or either of them, is produced from said land, or lands unitized therewith, by the Lessee, in paying quantities." But the lease also contained what is known as a Pugh clause limiting the extent the lease could be perpetuated through production from a well elsewhere on a unit. And based on this clause, the parties also disputed whether the lease had expired below certain depths.

The fourth paragraph in the OXY Lease involves the delegation of Thoroughbred's power to pool or unitize. It is the centerpiece of Thoroughbred's claim. It states in relevant part:

"Lessee is granted the right and power to pool or unitize all, or part of the lands covered hereby with adjoining or contiguous lands in order to form a unit, or units, *for the production of oil and/or gas when said units are necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowable are established by State, Federal or other regulatory bodies.* All lands so pooled into a unit or units, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if said lands were included in the lease. If production is found on the pooled lands, it shall be treated as if production is had from this lease, whether the well, or wells be located on the lands covered by this lease or not. Any well drilled on any such units shall be considered as a well hereunder. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit, only such portion of the royalties stipulated herein as a portion of the above-described lands placed in said unit bears, on an acreage basis, to the total lands so pooled or unitized in the particular unit involved." (Emphasis added.)

Two portions of this paragraph are particularly important. First is the condition placed on unitization—"when said units are necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowable are established by State, Federal or other regulatory bodies." Second is that the lease allows unitization for the production of "oil and/or gas." And this second provision must be contrasted against the Declaration of Unitization filed by Thoroughbred with the register of deeds that states the intention to unitize and pool the leases

"*as to the gas rights* therein and thereunder so as to form the unit acreage described . . . and does declare the necessity and advisability of said pooling and

unitization in order to properly develop and operate said lease premises so as to promote the conservation of gas in and under and that may be produced from said premises." (Emphasis added.)

Whether the Declaration of Unitization's reference to "gas rights" unitized only the gas—but not the oil—is another disputed point. Finally, the OXY Lease requires the lessee to "drill all wells necessary to prevent drainage from offsets on adjoining lands." This provision is central to Kansas City Royalty's drainage claim.

## The Litigation

In 2002, Thoroughbred sued Kansas City Royalty for a declaratory judgment that Thoroughbred had been mistaken when it included the Oxy Lease in the Rietzke Unit. Thoroughbred sought an order removing the lease from the Declaration of Unitization, a determination that Kansas City Royalty was not entitled to payments for any Rietzke Unit production, and the return of all royalties previously paid. Kansas City Royalty counterclaimed that Thoroughbred had (1) breached the OXY Lease and the Declaration of Unitization by failing to pay its share of royalties from production on the Rietzke Unit; (2) breached its duty under the OXY Lease to develop the Rietzke Unit and drill all wells necessary to protect Kansas City Royalty's land from drainage; (3) breached its duty under the OXY Lease and as the common operator of the Bird Well to protect the Rietzke Unit from drainage; (4) breached its duty under the lease to provide information on well production; and (5) unjustly enriched itself by retaining Kansas City Royalty's share of unit production revenues.

In September 2003, Thoroughbred filed its first partial summary judgment motion. In it, Thoroughbred claimed the OXY Lease's unitization provision unambiguously restricted the conditions under which the mineral interests could be unitized and that those requisites were not met when Thoroughbred filed its Declaration of Unitization. In other words, Thoroughbred argued it lacked authority to include the OXY Lease in the Rietzke Unit because unitization was unnecessary to conform to regular spacing patterns or to produce a full allowable as provided in the lease. Kansas City Royalty argued summary judgment was improper because "OXY

provided all necessary consents and granted Thoroughbred all power necessary to pool the Subject Lease." Highly summarized, Kansas City Royalty essentially claimed the OXY Lease was ambiguous and that parol evidence established the parties' intent that land covered by the OXY Lease was to be included in the Rietzke Unit.

In January 2005, the district court denied Thoroughbred's first partial summary judgment motion. It found "there is in fact an inherent ambiguity in the lease as is demonstrated by the actions of [Thoroughbred] when including the subject premises in the Declaration of Unitization." It further held there were disputed material facts about whether the lease's conditions regarding well spacing and "allowable" regulations were met and these facts were relevant to whether Thoroughbred intended to include the OXY Lease in the Rietzke Unit.

The litigation pressed on until April 2007, when Kansas City Royalty filed a summary judgment motion on Thoroughbred's claims. Its arguments at this stage are more difficult to summarize because alternative claims were presented, including: (1) the OXY Lease was ambiguous, necessitating equitable construction; (2) the OXY Lease was unambiguous and all the prerequisites to unitization were satisfied; (3) the parties entered a subsequent agreement allowing unitization; and (4) Kansas City Royalty ratified or modified the OXY Lease by its conduct, such as accepting royalty payments from the Rietzke Unit's production. Thoroughbred responded with a cross-motion for summary judgment essentially relitigating the same issue raised in its 2003 partial summary judgment motion that the OXY Lease was unambiguous and did not permit unitization under the then-existing circumstances.

At the hearing on these motions, the district court asked whether the parties' conduct could be considered and whether this conduct could modify the written agreement. Thoroughbred argued Kansas law prohibits parol or extrinsic evidence to interpret unambiguous contract language. The court responded by asking whether "parties, ever by their conduct, make a completely separate contract than what they've written and expressed to agree to?" And in what appears to be a related point, Kansas City Royalty claimed there

was a "ratification" or "modification" of the OXY Lease or a separate agreement entirely that the parties consummated by their conduct, stating:

"The third category . . . if your Honor is considering our position about whether you characterize our position as one of ratification, or as of modification of the existing agreement, or the consummation of a completely separate agreement, we believe it is perfectly appropriate for the Court to look at all of the circumstances surrounding the transactions. Because, in this case, we're not asking Your Honor to consider that other evidence to discern the intent of the written lease, but rather we're asking Your Honor to consider the conduct in determining whether we're right that there was a separate agreement between the parties."

The district court granted Kansas City Royalty's summary judgment motion and denied Thoroughbred's, although it did not detail its reasoning, which causes some befuddlement for an appellate court on review.

The journal entry, which was prepared by Kansas City Royalty's counsel, simply stated there was no genuine issue of material fact and that Kansas City Royalty was entitled to judgment as a matter of law. It then recited five legal conclusions: (1) The lease remained in full force and effect as it covers all rights from the surface down to the Marmaton-Altamont interval; (2) the Declaration of Unitization remained in effect as to the original 640 acres; (3) production in the Rietzke Unit must be apportioned among the mineral owners; (4) Kansas City Royalty was entitled to an accounting and apportionment of all unit production attributable to its working interest for each well producing below the base of the Marmaton-Altamont interval; and (5) Kansas City Royalty was entitled to an accounting and apportionment of all unit production attributable to its working interest from each well from the surface down to the base of the Marmaton-Altamont interval.

Thoroughbred objected to this journal entry. It alleged the journal entry decided issues not raised by the parties by granting Kansas City Royalty an interest in both oil and gas production and a working interest to all depths under the lease's Pugh clause. Kansas City Royalty countered by characterizing these issues as falling "like dominoes" once the court decided Kansas City Royalty's Oxy Lease belonged in the Rietzke Unit, although as we detail later that

is not the case. The district court denied Thoroughbred's objections. An interlocutory appeal was attempted on this summary judgment order, but the Court of Appeals refused to consider it. See K.S.A. 60-2102(c) (Court of Appeals has discretion to permit certain interlocutory appeals).

Kansas City Royalty's counterclaim on drainage then proceeded to trial, along with a determination of damages on the claim Thoroughbred lost on summary judgment. At the beginning of the drainage trial, Kansas City Royalty's counsel indicated the parties were appearing on its counterclaim, so Kansas City Royalty was the plaintiff for all practical purposes. Kansas City Royalty then presented its witnesses. After that, Thoroughbred presented its witnesses.

It is unnecessary to detail the trial testimony. It is sufficient to note the district court ruled against Kansas City Royalty on its drainage counterclaim. And, consistent with Kansas City Royalty's assertions, the district court held Kansas City Royalty had the burden to prove drainage. It then held Kansas City Royalty failed to meet that burden because it was no more probably true than not that any drainage occurred. The district court further held Thoroughbred took reasonable steps to protect the Rietzke Unit from drainage by drilling other wells.

As to monetary damages from the royalties claim, the district court awarded Kansas City Royalty $597,420.95 based on a factual stipulation as to the amounts. This award covered royalty payments, prejudgment interest, and attorney fees.

Both parties appealed to the Court of Appeals. Thoroughbred argued the district court erred by (1) granting Kansas City Royalty summary judgment and finding the OXY Lease was properly included in the Rietzke Unit; (2) finding the lease did not expire as to certain depths under the Pugh clause; (3) deciding issues not litigated when it held the unit included oil production; and (4) awarding prejudgment interest and attorney fees. Kansas City Royalty cross-appealed on two issues. First, it argued the district court erred by placing the burden of proof on it at trial to prove drainage. Second, it argued the district court erred by awarding it only one-third of its requested attorney fees.

The Court of Appeals upheld the district court's order in all respects, although it relied on different rationales in two instances. *Thoroughbred*, 45 Kan. App. 2d 312. First, the panel held it was unnecessary to determine whether the OXY Lease was ambiguous because it could reform the lease on appeal based on what it found was the parties' mutual mistake of including the condition limiting when unitization could occur. 45 Kan. App. 2d at 323-25. Second, it held the district court properly awarded Kansas City Royalty revenue from oil production as an incidental byproduct of the gas production. 45 Kan. App. 2d at 327.

Neither party was satisfied with this result. Both petitioned this court for review, which we granted under K.S.A. 20-3801(b) (review of Court of Appeals decision). We obtained jurisdiction under K.S.A. 60-2101(b). We address the issues in a different order than the Court of Appeals in our attempt at additional clarity.

KANSAS CITY ROYALTY'S DRAINAGE CLAIM

In its counterclaim, Kansas City Royalty argued the Bird Well, which is adjacent to the Rietzke Unit and also operated by Thoroughbred, drained minerals from beneath the Rietzke Unit. "Drainage" is the "[m]igration of oil or gas in a reservoir due to a pressure reduction caused by production from wells bottomed in the reservoir." 8 Williams & Meyers, Manual of Oil and Gas Terms, p. 279.

Generally, the duty to drill an "offset well" to prevent or protect against drainage—often called the "offset well covenant"—is a contractual duty, either express or implied, in an oil and gas lease. See 8 Williams & Meyers, Manual of Oil and Gas Terms, pp. 684-85; *Renner v. Monsanto Chemical Co.*, 187 Kan. 158, 167, 354 P.2d 326 (1960) (when lease does not contain express protection against drainage, the law imposes duty under doctrine of implied covenants).

The OXY Lease contains a drainage clause requiring Thoroughbred to "drill all wells necessary to prevent drainage from offsets on adjoining land." And consistent with that provision, the district court held Thoroughbred's duty to offset was contractual and arose from the OXY Lease. But it also held Kansas City Royalty failed to

prove drainage. It found it was no more probably true than not that Thoroughbred's Bird Well drained minerals from the Rietzke Unit and, therefore, Kansas City Royalty failed to meet its burden of proving drainage. It further held Thoroughbred took reasonable steps to protect the Rietzke Unit from drainage by drilling additional wells, which produced either poorly or not at all.

On appeal, Kansas City Royalty does not take issue with the district court's characterization of the evidence. Instead, it simply argues the district court erred by placing on it the burden of proving drainage. Kansas City Royalty argues Thoroughbred should have had that burden because it was the common operator for the two units.

But we do not need to decide that question because we adopt the Court of Appeals' holding that Kansas City Royalty invited any error on the burden-of-proof issue. See *Thoroughbred*, 45 Kan. App. 2d at 328-29. Notably, Kansas City Royalty does not address the panel's invited error finding. See *State v. Allen*, 293 Kan. 793, Syl. ¶ 2, 268 P.3d 1198 (2012) (party must allege an issue was decided erroneously by the Court of Appeals).

The Court of Appeals focused on the parties' presentation of the drainage claim at trial, because when the proceedings began, Kansas City Royalty told the district court: "Though we're the Defendant, we're the counter-claimant, and really what's here is our counterclaim. *So, actually, we're the Plaintiffs for practical purposes today.*" (Emphasis added.) Kansas City Royalty then presented its witnesses, followed by Thoroughbred. Posttrial, Thoroughbred submitted proposed findings which included a statement that "[t]he trial on damages and the claim that defendants' acreage has been drained by the Bird well owned by [Thoroughbred] arises from [Kansas City Royalty's] counterclaim. *Accordingly, [Kansas City Royalty has] the burden of proof on this drainage claim.*" (Emphasis added.) In its response, Kansas City Royalty indicated no objection to Thoroughbred's proposed finding as to which party had the burden of proof. See *Thoroughbred*, 45 Kan. App. 2d at 327-30.

The district court no doubt relied on Kansas City Royalty's assertions—both during and after trial—when it held that Kansas

City Royalty carried the burden of proof. It is too late to change course now. See *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003) ("A party may not invite error and then complain of that error on appeal."). Similarly, Kansas City Royalty may not raise a new issue for the first time on appeal. See, *e.g.*, *Spurgeon v. Union National Bank*, 137 Kan. 98, Syl. ¶ 1, 19 P.2d 459 (1933), in which this court held:

"In the trial of a civil action, when there is a question upon which party the burden of proof rests, a party who assumes the burden of proof, without objections, and makes no contention in the trial court that the court erred in placing the burden of proof on him, is not in position to raise that question for the first time in this court."

We affirm the district court's finding that Kansas City Royalty failed to prove its drainage claim, and address Thoroughbred's arguments next.

## AUTHORITY TO INCLUDE OXY LEASE IN THE UNIT

The district court granted Kansas City Royalty's summary judgment motion and denied Thoroughbred's cross-motion, finding that Kansas City Royalty's Oxy Lease was properly included in the Rietzke Unit. Thoroughbred argues its summary judgment motion should have been granted instead, excluding Kansas City Royalty's Oxy Lease from the unit. The standard of review on summary judgment is well known:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

Thoroughbred's arguments for excluding the OXY Lease from the Rietzke Unit are straightforward. It contends the lease's unitization clause unambiguously limits its authority to unitize the leasehold to only those instances when unitization is "necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowable are established by State, Federal or other regulatory bodies." Thoroughbred argues those conditions were not met and that it acted without authority when it included the lands subject to the OXY Lease in the Rietzke Unit.

Kansas City Royalty's arguments are more intricate, presenting alternative—and at times contradictory—claims. For example, Kansas City Royalty suggested the OXY Lease is ambiguous, citing *Akandas, Inc. v. Klippel*, 250 Kan. 458, 827 P.2d 37(1992), which asked the court to employ rules of construction only applicable once a contract is found ambiguous. 250 Kan. 458, Syl. ¶¶ 2, 11. But Kansas City Royalty's response to Thoroughbred's motion flatly states: *"Defendants agree with Plaintiffs that the unitization clause is not ambiguous."* (Emphasis added.) Kansas City Royalty then argues in the alternative that the prerequisites to unitization were satisfied, suggesting again that the contract is unambiguous.

More relevant to our disposition of this appeal, Kansas City Royalty argued the OXY Lease was not the parties' only agreement. It asserted it either consented to or modified the prior agreement or entered into a separate agreement with Thoroughbred, and by doing so, waived any right to object to inclusion of the Oxy Lease in the Rietzke Unit. The parties' disputes over these contentions invoke numerous principles of contract law. See 3 Williams & Meyers, Oil and Gas Law § 658, p. 748 (2012). We explore those next.

## Was the OXY Lease Ambiguous?

We begin by reviewing Thoroughbred's claims that the contract unambiguously prohibited unitization. The crux of that controversy is whether parol or extrinsic evidence is admissible to demonstrate what the parties' intended, and thus what the actual effect of the Declaration of Unitization is.

Generally, extrinsic evidence is not admissible to contradict, alter, or vary the terms of a written instrument, but it is admissible to aid in the construction of a silent or ambiguous contract. *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452, 827 P.2d 24 (1992). In certain circumstances, extrinsic evidence is also admissible to establish mutual mistake, even when the contract is clear and unambiguous. See, *e.g.*, *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 298, 736 P.2d 888 (1987).

"[A] contract is 'ambiguous' only when the words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings." *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, 534, 722 P.2d 1073 (1986). A contract must be construed within its four corners and all provisions considered together, not in isolation. When ambiguity appears, the language is interpreted against the party who prepared the instrument. 239 Kan. at 534; see also *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, Syl. ¶ 1, 679 P.2d 158 (1984) (ambiguities construed in favor of lessor because lessee usually provides lease form or dictates the terms).

The district court denied Thoroughbred's 2003 partial summary judgment motion, stating: "[T]here is in fact an inherent ambiguity in the lease as is demonstrated by the actions of [Thoroughbred] when including the subject premises in the Declaration of Unitization." It also held there were disputed material facts regarding whether the conditions established in the lease about well spacing and allowable regulations were met, which the district court found relevant to whether Thoroughbred intended to include the lease in the Rietzke Unit. And when the district court denied Thoroughbred's 2007 summary judgment motion relitigating the same issue, the court's rationale was not articulated because the journal entry merely concluded the OXY Lease continued to be part of the Rietzke Unit.

The district court's analysis in denying Thoroughbred's first partial summary judgment motion was flawed because it looked to extrinsic evidence regarding the parties' actions to determine whether there was ambiguity in the contract language. But extrinsic evidence is only admissible if the four corners of the contract es-

tablish an ambiguity. *Barbara Oil Co.*, 250 Kan. at 452. The district court appears not to have engaged in a four-corners review of the OXY Lease. And its failure to articulate its rationale for denying Thoroughbred's 2007 summary judgment motion makes it unclear whether the district court simply relied on its earlier, erroneous analysis or accepted some other rationale.

The interpretation and legal effect of written instruments are matters of law over which appellate courts exercise unlimited review, including whether a written instrument is ambiguous. So we need not linger long upon what the district court was thinking, or what it did not do, in reaching its conclusion. *City of Arkansas City v. Burton*, 284 Kan. 815, 828-29, 166 P.3d 992 (2007). Appellate courts may construe and determine a written instrument's legal effect without regard to the interpretation given to it by the district court. 284 Kan. at 828-29. Therefore, we may construe the OXY Lease despite the lack of insight into the district court's analysis.

The OXY Lease's unitization clause expressly authorizes the lessee to unitize the land covered by the lease for the "production of oil and/or gas when said units are necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowables are established by State, Federal, or other regulatory bodies." This provision clearly and unambiguously limits the authority to unitize unless one of two alternative conditions is met: (1) when unitization is necessary to conform with spacing patterns as established by a regulatory body; or (2) when unitization is necessary to produce a full allowable as established by a regulatory body. And although Kansas City Royalty has made statements suggesting otherwise, it clearly conceded this point by stating: "Defendants agree with Plaintiffs that the unitization clause is not ambiguous." Our reading of the OXY Lease shows this statement is true. The next question is whether either condition was met.

*Were Conditions for Unitizing the OXY Lease Lands Met?*

In its 2007 motion for summary judgment, Thoroughbred addressed the conditions precedent by affirmatively alleging they were not satisfied, stating:

"9. During the entire primary term of the Subject Lease, no State, Federal or other regulatory body with jurisdiction established any regular spacing pattern or patterns for the lands covered by said lease, or required unitization of said lease or of the lands covered thereby in order to produce a full allowable. (Affidavit of John McCannon, attached hereto as Exhibit H.)"

The affidavit referred to was submitted by John McCannon, assistant general counsel in the conservation division of the Kansas Corporation Commission. His affidavit stated his responsibilities included familiarity with the general rules and regulations for the conservation of crude oil and natural gas adopted by the KCC. McCannon further declared there was no statute, rule, regulation, or order by any Kansas, federal, or other regulatory body "that would have required unitization of an oil and gas lease covering said lands with any other lease or leases to obtain a full production allowable for a well located thereon, so long as the well in question drilled on or offsetting said lands was located at least 330 feet away from the nearest lease boundary."

Kansas City Royalty attempted to controvert this paragraph's allegations by stating:

"9. Controverted. See Response to No.7 above. See also PMPSJ Ex. H (McCannon Aff.) at ¶¶ 4 & 5, which confirms that the location of the Rietzke 1-21 Well (and all other wells subsequently developed in the Rietzke Unit) will qualify for a full allowable and will be in compliance with applicable statewide regulations."

And in its response to paragraph 7, Kansas City Royalty gave a lengthy statement, the relevant portion stating:

"Furthermore, the State of Kansas has established statewide regulations pertaining to well location and well spacing patterns and well allowables that are applicable statewide, which renders Thoroughbred's interpretation of this clause moot and irrelevant. Furthermore, the location of the Rietzke 1-21 well was staked at a location which qualifies it for a full allowable. Thoroughbred's own witness, a state employee, purportedly well-versed in Kansas regulatory law, confirms this fact. See PMPSJ Ex. H (Affidavit of John McCannon (hereinafter 'McCannon Aff.')) at ¶¶ 4 and 5. See also DMSJ Ex. 4 (Affidavit of Steve Flynn (hereinafter 'Flynn Aff.')) at Ex. D (entitled 'Documents from Rietzke File Provided by OXY USA to Kansas City Royalty Company, LLC') at page marked by hand as p. 30 (plat of proposed unit with handwriting indicating 'Rietzke # 1 API# 15-033-209690000')."

But Kansas City Royalty's summary judgment briefing neglected to do what it needed to do to controvert the factual assertions in Thoroughbred's paragraph 9, *i.e*, allege the OXY Lease's inclusion in the Rietzke Unit was "*necessary to* conform with regular spacing patterns, or to produce a full allowable." (Emphasis added.) And under the OXY Lease's unambiguous terms, it was insufficient to simply assert some regulations existed.

The McCannon affidavit established the necessary conditions were not satisfied, and the affidavit was not controverted in a material manner on this issue. Therefore, there were no material factual disputes as to this issue. Kansas City Royalty was relying on its erroneous legal interpretation of the OXY Lease to assert what is a factual contention. See *Shamberg, Johnson & Bergman*, 289 Kan. at 900 (adverse party must come forward with evidence to establish a dispute as to a material fact when opposing summary judgment).

Since the contract is not ambiguous and the absence of any conditions precedent to unitization was not controverted, Thoroughbred was entitled to summary judgment unless Kansas City Royalty could prevail on one of its alternative claims. We consider that prospect next.

*Kansas City Royalty's Alternative Claims*

During the hearing on the 2007 summary judgment motions, the district court inquired whether the OXY Lease was an integrated contract and whether the parties could have reached another agreement. But we cannot determine from the record whether the district court's inquiries were resolved. Whether any particular term of a written contract has been modified or waived by a subsequent agreement is a question of fact for the trial court. *Coonrod & Walz Constr. Co., Inc. v. Motel Enterprises, Inc., et al.*, 217 Kan. 63, Syl. ¶ 2, 535 P.2d 971 (1975).

In *Klippel v. Beinar*, 222 Kan. 681, 567 P.2d 867 (1977), this court recognized owners of an interest in oil and gas may be bound to a unitization agreement by accepting royalty payments. As the *Klippel* court explained:

"It has been held that the owner of an interest in oil and gas in a unitized pool who did not sign a unitization agreement may nevertheless ratify and be bound

according to its terms by accepting royalties and paying unit expenses on the basis of his acreage as provided in the unitization agreement. The acceptance of a unitizing agreement is not required to be in writing nor need it be signed by a party in whose favor it is made, but it may be sufficient that such party knowingly accepts benefits and by doing so he becomes bound by its terms. [Citations omitted]. The binding effect of ratification of a unitizing agreement has been recognized under varying circumstances. [Citations omitted]." 222 Kan. at 686.

In some jurisdictions "[t]he execution of a unitization agreement by the lessor in a lease has been held a waiver of all past lease defaults and ratification of the lease in the unit." 4 Summers, Oil and Gas, § 56:4, p. 492 (3d ed. 2009); see *Kaufman v. Arnaudville Company*, 186 So. 2d 337 (La. App. 1966); *Beck v. Wight*, 116 Mont. 345, 151 P.2d 1014 (1944); *Westbrook v. Atlantic Richfield Company*, 502 S.W.2d 551 (Tex. 1973). Therefore, the issuance and acceptance of royalty payments may serve to maintain or ratify an agreement for both parties—depending on the facts in a particular case.

Other courts, for example, have recognized a party may be equitably estopped from challenging an agreement after accepting royalty payments for a prolonged period. See, *e.g.*, *Eagle Oil Co. v. Sinclair Prairie Oil Co.*, 105 F.2d 710, 714 (10th Cir. 1939) (lessors were estopped from denying that premises were held under another lease after accepting royalties). And our Court of Appeals has commented on the equitable effects of royalty payments in oil and gas cases, stating:

"When applying equitable estoppel in the oil and gas arena, the authorities look at the nature of what the lessor receives. Generally, if the landowner, the lessor, receives *a benefit* from the payment of royalties, then the lessor is estopped from asserting that the lease terminated. But if the lessor did not receive a benefit from the payment of royalties, then the lessor should not be estopped from claiming the lease terminated. [Citation omitted.]" *Palmer v. Bill Gallagher Enterprises*, 44 Kan. App. 2d 560, 566, 240 P.3d 592 (2010), *rev. denied* 293 Kan. 1107 (2012).

Though caselaw appears silent as to whether a lessee is similarly estopped from challenging an agreement, this court has held as a general principle that "[a] party may not properly base a claim of estoppel on its own wrongful act or dereliction of duty, or for acts

or omissions induced by its own conduct." *Gillespie v. Seymour*, 250 Kan. 123, 130, 823 P.2d 782 (1992).

But whether Kansas City Royalty's various alternative claims have any potency depends on findings of fact that have not yet been made. We cannot discern from the district court's 2007 summary judgment order whether it found one of these alternative arguments meritorious. We must remand to the district court to determine whether summary judgment is appropriate on these alternative claims and, if not, how to resolve them.

This holding makes it unnecessary to provide a protracted discussion of the mutual mistake analysis adopted by the Court of Appeals. But in that regard, it is sufficient to note we disagree with the panel's holding that "the parties effectively agreed the OXY lease was granted to Thoroughbred based on a mutual understanding that it would be placed in the Rietzke Unit." *Thoroughbred*, 45 Kan. App. 2d at 319. A review of paragraphs 15, 21, and 22 of Thoroughbred's response to the summary judgment motion demonstrates there was a factual dispute as to this point because Thoroughbred alleged Kansas City Royalty failed to establish Thoroughbred's intent. See *Shamberg, Johnson & Bergman, Chtd.*, 289 Kan. at 900 ("The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought.").

We reverse this portion of the Court of Appeals decision. But we note the issue remains open for the district court to consider if it determines the proper procedure for raising it was followed. See K.S.A. 60-511 (5-year statute of limitations on mutual mistake claims).

THE RIGHT TO ROYALTIES FROM OIL PRODUCTION

If the district court again concludes Kansas City Royalty is entitled to participate in the Rietzke Unit based on its alternative claims, the scope of that interest must also be addressed. Before the lower courts, the parties disputed the unit's scope in two ways.

First, Thoroughbred argued that under the Pugh clause the lease had expired below the Marmaton-Altamont interval because Thoroughbred did not drill below that depth during the primary lease

term. The district court held Kansas City Royalty had a working interest in the Rietzke Unit below the base of the Marmaton-Altamont interval and granted Kansas City Royalty summary judgment on that issue. The Court of Appeals affirmed. *Thoroughbred*, 45 Kan. App. 2d at 326. Thoroughbred did not petition for review of that determination, and it has become the law of the case. See *Venters v. Sellers*, 293 Kan. 87, 99, 261 P.3d 538 (2011) (The law of the case prevents relitigation of the same issues within successive stages of the same suit.).

Second, Thoroughbred argued Kansas City Royalty was only entitled to share in gas production, not oil production. In contrast, Kansas City Royalty argued it had a right to share in production of all minerals. This dispute arises because the OXY Lease authorizes Thoroughbred to unitize both oil and gas rights: the "Lessee is granted the right and power to pool or unitize all, or part of the lands . . . with adjoining or contiguous lands in order to form a unit . . . *for the production of oil and/or gas* . . . ." (Emphasis added.) But when Thoroughbred filed its Declaration of Unitization, it limited the unit to gas production, stating: "THOROUGHBRED ASSOCIATES, LLC, does hereby declare and give public notice by the execution and filing of this instrument of its purpose to unitize and pool the . . . Leases *as to the gas rights therein* and thereunder . . . ." (Emphasis added.)

The district court's 2007 summary judgment order implicitly grants Kansas City Royalty an interest in both oil and gas production by stating:

"(3) all production from anywhere in the (Thoroughbred Rietzke) Unit shall be apportioned among the mineral owners in the Unit on an acreage basis, *i.e.*, in the proportion of the owners interest in the minerals under the lands unitized bears to the full mineral interest under all lands unitized."

But the district court's reasoning for this apportionment order is not provided for our review. The Court of Appeals affirmed the district court after finding the oil production was an incidental by-product of the gas production, citing *Skelly Oil Co. v. Savage*, 202 Kan. 239, 248-49, 447 P.2d 395 (1968). *Thoroughbred*, 45 Kan. App. 2d at 327. Thoroughbred petitioned this court for review on

this question, arguing the district court's finding was unsupported by Kansas City Royalty's summary judgment motion and the Court of Appeals erred by relying on *Skelly Oil* because the panel decided a fact—that the oil production was an incidental byproduct of gas production—without any evidence in the record.

We agree the issue cannot be decided at this juncture and on this record. We consider first the Court of Appeals' analysis and then address what dispositions may be appropriate now.

In *Skelly Oil*, the unitization clause in the oil and gas lease provided for the pooling of "gas rights only." But the lease did not define "gas rights." The trial court found the well was a gas well and the liquids produced came with the gas. It held: " 'the fact that the drill site oil and gas lease contains no separate pooling clause permitting the pooling of oil from an oil well, does not preclude the pooling of liquids produced in conjunction with and as a by-product of the production of gas from the gas unit.' " 202 Kan. at 241-42. On appeal, this court affirmed, based on the case's facts and the court's construction of the lease provision, holding that the "condensate or distillate, on the admitted facts before us, was a constituent element of the gas produced and under the pooling clause of the lease payment therefor should be made proportionately to all the parties having an interest in the gas unit." 202 Kan. at 249.

An important problem with the application of the *Skelly Oil* case as authority is that Kansas City Royalty failed to establish the legal and factual record necessary to determine whether that decision's reasoning is applicable. The threshold question is whether the Declaration of Unitization created a gas unit. If so, the second question is how to define the gas rights. And once that determination is made, a factual inquiry remains as to whether the oil production that occurred is included under the Declaration of Unitization. The Court of Appeals erred in finding *Skelly Oil* applicable based on the state of the record on appeal.

In its summary judgment motion, Kansas City Royalty cited the OXY Lease provision allowing unitization of both "oil and/or gas," but it omitted the very specific language in the Declaration of Unitization expressly limiting the unit to gas production. Then in its

analysis section, Kansas City Royalty broadly stated: "The Unit Declaration executed and filed by Thoroughbred unequivocally unitizes the Subject Lands as to all depths, and as to all production from wherever it is obtained in the Unit." And then without citation to any evidence, Kansas City Royalty further stated:

> "Subsequent to acquiring the Subject Lease, these are the relevant facts:
> . . . .
> "• Thoroughbred did not limit the Unit Area as to gas production; and
> "• Thoroughbred has obtained gas production and oil production, *i.e.*, 'production' under the Unit Declaration."

Kansas City Royalty then declared: "The logical and fair construction of these events is that Thoroughbred intended to form, and did form a Unit that is not limited in depth or production obtained."

This is far too great a stretch based on the record. Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver,* 289 Kan. 891, 900, 220 P.3d 333 (2009). The motions on this issue failed to present the necessary legal arguments and facts to the district court, and the Court of Appeals panel's holding that the oil at issue in this case was an incidental byproduct of the gas production is unsupported. Indeed, Kansas City Royalty curiously points to exhibits admitted at the drainage trial, which occurred after summary judgment was granted, to argue that "most, if not all of the producing wells in the Rietzke Unit produce, or have produced both oil and gas (and their constituent products and by-products) at various depths and at different times in the reservoir's life cycle." Those exhibits were not before the district court when it granted summary judgment, and they are not relevant to whether summary judgment was proper.

We reverse and remand to the district court for further proceedings as to these issues—if the district court concludes the OXY Lease should be included in the Rietzke Unit. In light of this holding, the district court's award to Kansas City Royalty for royalty

payments, prejudgment interest, and attorney fees under K.S.A. 55-1617 is reversed and vacated.

## MOTION FOR APPELLATE ATTORNEY FEES

The final matter is Kansas City Royalty's motion for appellate attorney fees under Supreme Court Rule 7.07(b) (2012 Kan. Ct. R. Annot. 66). Kansas City Royalty seeks attorney fees incurred before the Court of Appeals and this court.

We may dispose quickly of the issue of fees incurred before the Court of Appeals because Kansas City Royalty did not file a timely Rule 7.07(b) motion with that court. Therefore, it has not preserved its right to fees incurred before the Court of Appeals. Rule 7.07(b) (motion for attorney fees must be filed not later than 14 days after oral argument); *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 167, 298 P.3d 1120 (2013) ("We reaffirm that if a party would be entitled to appellate attorney fees under a statute or contract upon prevailing on appeal, then the party must timely file a Rule 7.07[b] motion in order to preserve the right to those fees.").

The remaining question is whether Kansas City Royalty is entitled to fees incurred before this court as part of its efforts to protect its interest in the Rietzke Unit and to recover proceeds of the unit's oil and gas production. A Kansas court may not award attorney fees unless a statute authorizes the award or there is an agreement between the parties allowing attorney fees. *Snider*, 297 Kan. 157, Syl. ¶ 2. K.S.A. 55-1617 provides that authority in certain circumstances, stating:

"The district court of the county in which oil or gas is produced shall be a court of proper venue for proceedings brought pursuant to [the Interest on Proceeds from Production Act]. The prevailing party in a proceeding brought pursuant to this act on which a judgment is rendered may recover costs and reasonable attorney fees at the discretion of the court."

Rule 7.07(b) authorizes appellate courts to award attorney fees for "services on appeal in a case in which the district court had authority to award attorney fees." (2012 Kan. Ct. R. Annot. 66.) The rule provides no greater authority to award attorney fees than the statute applicable to the district court. See *Rinehart v. Morton*

*Buildings, Inc.,* 297 Kan. 926, Syl. ¶ 6, 305 P.3d 622 (2013). The problem, of course, is that at this stage in the proceedings Kansas City Royalty has not prevailed because this court has reversed the Court of Appeals decision affirming the district court's order granting summary judgment to Kansas City Royalty and reversed and vacated the district court's attorney fee award. On remand, Kansas City Royalty may—or may not—prevail on the merits of the issues remaining in the case.

The most critical factor in determining the reasonableness of a fee is the degree of success obtained because prevailing party status alone may say little about whether the expenditure of an attorney's time was reasonable in relation to the success achieved. *Snider,* 297 Kan. 157, Syl. ¶ 10. Kansas City Royalty's motion for appellate attorney fees before this court recognizes it must prevail to be entitled to fees. Indeed, it conditions the motion on its anticipated status as a prevailing party. In addition, its fee application includes time incurred on portions of the case Kansas City Royalty has clearly lost, *i.e.*, its drainage claim and its contention the OXY Lease permitted unitization based on its clear and unambiguous terms.

Given the Kansas City Royalty's failure to prevail in this appeal in light of our reversal and remand, the uncertainties as to Kansas City Royalty's potential success on remand, and the obvious commingling in the fee application of attorney time for issues on which Kansas City Royalty has clearly lost, we deny the attorney fee request under the circumstances presented.

Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings.

\* \* \*

JOHNSON, J., concurring in part and dissenting in part: I agree with the majority on the drainage issue. Kansas City Royalty Company, L.L.C., *et al.*, had the opportunity to litigate its drainage claims against Thoroughbred Associates, L.L.C., and nothing in the record would persuade me to disturb the district court's assessment that the claims were not adequately proved. For simplicity, hereafter I will refer to the Kansas City Royalty Company, L.L.C. as

either lessor or property owner and will refer to Thoroughbred Associates, L.L.C. as either lessee or operator.

Where I initially part company with the majority is when it opines that lessee would be entitled to summary judgment if the matter is to be decided solely under the unambiguous terms of the oil and gas lease. Although I do not believe that the "conditions" in the fourth paragraph of the oil and gas lease are plain and unambiguous, my more fundamental problem with the majority opinion is that I cannot accept the nonsensical notion that lessee can use its own breach of contract as a ground to obtain any remedy from lessor, much less a rescission of the unitization agreement and return of years' worth of royalties. Accordingly, given that there is no legal way that lessee/operator can force a partial rescission of its unitization agreement under the facts of this case, I would simply affirm the district court's grant of summary judgment to lessor/property owner rather than remanding for further proceedings on any "alternative theories."

As I understand the facts, operator obtained the lease from owner's predecessor in title in July 1998, shortly after operator had drilled the good-producing gas well, known as the Bird Well, on nearby land. Soon after the subject lease became effective, operator filed the Declaration of Unitization that combined lessor's land with other lands to form the 640-acre Rietzke Unit, the boundaries of which zigzagged through three different sections, including 480 acres in Section 21, 40 acres in Section 22, and the 120 acres in Section 16 in which lessor had an interest. The recorded Declaration of Unitization states that all of the leases in the unit "grant the right, power and privilege to the Lessee or his assigns, to pool or combine the acreage covered by each lease so as to form a gas production unit to cover, limit, and restrict only the acreage covered by each lease and not exceeding 640 acres." In other words, the declaration indicates that some of the leases, albeit not the subject lease, contained a 640-acre limitation on the size of any gas unit that could be unilaterally formed by the lessee, which might provide some insight into why lessee chose 640 acres for the size of the gas unit in this case.

Operator proceeded to develop the Rietzke Unit, and according to a map in the record, a well was drilled on the 120-acre tract in which lessor had an interest. That certainly suggests that lessee finagled the boundaries of its maximum-sized unit to include lessor's tract for development reasons. Nevertheless, the map indicates a dry hole on lessor's tract but that three other drill sites in the unit resulted in producing wells. A proportionate share of the royalties from the unit's production was paid to and accepted by lessor/property owner for some period of years. But when operator became aggravated with lessor for investigating whether the Bird Well was draining minerals from underneath the lands in the Rietzke Unit, operator suspended the payment of royalties to lessor, claiming that it had mistakenly included lessor's land in the unit. Approximately 4 years after unitizing lessor's land, operator filed a declaratory judgment action to effectively back out of that unitization.

Although the majority does not discuss any motive for operator to claim that its unitization of lessor's land did not conform to the lease provisions, I can discern no other reason than either retribution for lessor's having caused trouble about the Bird Well or destruction of lessor's standing to complain about the drainage from the Bird Well. Certainly, the motive could not have been the withheld royalties or the recovery of previously paid royalties, because those monies would not legally belong to operator. The other unit landowners would be entitled to the returned royalties based upon their newly calculated proportionate shares, using as a denominator the 520 acres remaining after lessor's land is retroactively kicked out of the unit. No wonder the other unit landowners joined with operator in its rescission attempt, even though none of the landowners apparently challenged the establishment of the unit in the beginning or voiced any complaint for all those years they accepted royalty payments under the unitization agreement.

As I view the majority holding, it would permit lessee to rescind the unitization arrangement with lessor through the ploy of claiming that lessee had been a wrongdoer in the beginning by unitizing lessor's land without having the authority to do so under the oil and gas lease. As evidence of its own breach of the lease, lessee

uses an affidavit from a Kansas Corporation Commission (KCC) employee that says the inclusion of lessor's land in the unit was not required by that regulatory agency. Never mind that lessor/property owner acquiesced in the unitization declaration, *i.e.*, effectively waived any wrongdoing in forming the unit; never mind that the condition of necessity of conforming to regular spacing patterns did not refer to KCC requirements; never mind that both lessee and lessor accepted and enjoyed their respective benefits from the unitization arrangement for years after lessee's alleged breach of the lease agreement without so much as a whimper of complaint; and, most importantly, never mind that rescinding the unitization agreement benefits the breaching party (lessee/operator) to the detriment of the nonbreaching party (lessor/property owner), *i.e.*, rewards lessee for an admitted failure to comply with its obligations under the oil and gas lease. That holding is repugnant to me on several levels.

Before proceeding with a legal analysis, I pause to analogize our situation with a more familiar transaction, given my fear that some people are intimidated by oil and gas law to the point of losing sight of what is actually happening. In my admittedly imperfect, but close, analog, a homeowner (seller) sells a person (buyer) some building lots that are near seller's own home. The sale contract includes a provision granting buyer an option to purchase an additional area that contains a storage shed, in the event buyer needs additional storage space after buyer completes the building of a house on the purchased lots. After building a home, buyer exercises the option; seller accepts the money and delivers the storage shed deed to buyer, who then records the deed and takes possession of the shed, filling it with buyer's possessions.

Four years later, seller complains that buyer is not mowing the grass on buyer's residential property and threatens to take action against buyer in order to avoid the impairment of the value of seller's adjoining home because of buyer's unsightly premises. Buyer reacts by declaring that buyer did not really need the storage space of the option property, as evidenced by an affidavit from the city's zoning administrator that says the city would not have required buyer to have additional storage space on his residential

property. Accordingly, buyer vacates the storage shed; demands the return of the purchase price; and ultimately sues for a declaratory judgment that buyer's exercise of the option was contrary to the terms of the written option contract because the condition precedent of necessity of additional storage space was not met.

Apparently, under the majority's rationale, buyer would be entitled to summary judgment that effectively rescinded the storage shed sale based on buyer's claim of buyer's own breach of the plain and unambiguous terms of the written option contract, as evidenced by the uncontroverted affidavit of the city employee. Again, never mind that seller had acquiesced in the exercise of the option in the first instance; never mind that the option did not specify that the storage necessity had to be required by zoning regulations; never mind that both parties had accepted and enjoyed their respective benefit of the bargain for years after buyer's alleged breach of contract; and never mind that the rescission would be detrimental to seller but would reward buyer for having breached the option contract.

Over a century ago, this court suggested that a party should not win all the marbles by throwing a postperformance, retroactive breach-of-contract flag on himself/herself/itself, even if the culprit has a facially seductive argument. In *Trust Co. v. McIntosh*, 68 Kan. 452, 463-64, 75 P. 498 (1904), this court discussed whether a plaintiff had "standing to impeach the defendant's conduct," specifically reciting some fundamental principles, to-wit:

" 'One who pays money on a contract cannot recover the same unless he is entitled to a rescission of the contract.

" 'The rescission of a contract is a remedy to be applied in the sound discretion of the court, and only he is entitled to it who can show that he is without fault, and that the other party is derelict.' (*Thomas v. McCue*, 19 Wash. 287, 53 Pac. 161.)

" 'It is obvious that the right to rescind a contract belongs only to the party who is himself without default. Even if he has sufficient grounds for rescission, if he has done some act which hinders performance by the other party, or has failed in any way to perform his own part of the contract, his right to rescind is forfeited.' 24 A. & E. Encycl. of L., 2d Ed., 647." 68 Kan. at 464.

The notion that a party rescinding must not be in breach or default is so established that it has its own section in Corpus Juris

Secundum, 17B C.J.S., Contracts § 633. Moreover, our sister states ascribe to the principle that "[a] party to a contract may not set up his own breach to relieve himself of his contractual obligations; nor may he set up his breach as the basis for rescission of the contract or *as the ground for his own recovery.*" (Emphasis added.) *Dorsett v. Cross*, 106 S.W.3d 213, 220 (Tex. App. 2003); *see also Hooper v. Commercial Lumber Company*, 341 P.2d 596, 598 (Okla. 1959) (contracting party cannot rescind or terminate contract because of own breach but right must be afforded by opposite party). Contrary to those rules, the majority here would permit Thoroughbred to utilize its own contract breach as the ground for its own recovery.

Nevertheless, my rejection of the majority decision is based on more than an aversion to putting our imprimatur on the concept of winning-by-wrongdoing. I take issue with the majority's construction of the oil and gas lease. Specifically, I discern that the majority has missed the point of the fourth paragraph of the lease.

I believe the problem is created when the majority ignores its recited principle that all of a contract's provisions are to be "considered together, not in isolation." *Thoroughbred,* 297 Kan. at 1206. Instead, the majority gets hung up on and focuses its entire attention on that certain language in the middle of the lease's fourth paragraph to which the lessee has misdirected us and to which the majority has assigned the label "the condition placed on unitization." *Thoroughbred,* 297 Kan. at 1197. That label suggests that unitization can *never* happen without meeting one of the "conditions" described in the fourth paragraph. As will be discussed later, that is simply not true.

But returning to the lease to view the forest, rather than the trees, we find that the very clear and explicit language beginning the fourth paragraph defines what is being created by that provision, as well as leading us to an understanding of the purpose for the conditions. That language reads: "Lessee is *granted the right and power* to pool or unitize all, or part of the lands covered hereby . . . ." (Emphasis added.) Obviously, lessor is giving lessee the authority to unitize lessor's land with other lands without the necessity of having to obtain lessor's approval, *i.e.*, lessee is granted the right to unilaterally unitize. With such unfettered power to

unilaterally unitize, it only makes sense that lessee's exercise of that power should be subject to certain conditions. In this lease, lessor chose to condition unilateral unification upon whether the unit was " 'necessary to conform with regular spacing patterns, or to produce a full allowable where such spacing pattern or allowable are established by State, Federal or other regulatory bodies.' " *Thoroughbred*, 297 Kan. at 1197. What the lease does *not* say is that unitization cannot happen without meeting those conditions; it only says that those are the conditions under which lessee is empowered to effect unilateral unitization. Unitization on any other basis than lessee's unilateral declaration is not foreclosed by the fourth paragraph.

Ascribing a limited effect to the fourth paragraph conditions becomes more compelling when one considers that the lease provision is not the only means whereby the subject land could have been unitized. Pursuant to K.S.A. 55-1301 *et seq.*, referred to as "the Kansas compulsory unitization law," *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, 995, 677 P.2d 991 (1984), and specifically under K.S.A. 55-1304, the KCC can compel the unitization of land after making certain findings of necessity, economic feasibility, and fairness. Nothing in the statute requires the unit to comply with any lease conditions before the KCC orders unitization. To the contrary, lease provisions are considered modified to the extent necessary to conform to the compulsory unitization act and, in fact, even unleased tracts can be included in the unit. K.S.A. 55-1308.

Additionally, the legislature has obviously contemplated that a unitization can occur consensually. K.S.A. 55-1317 addresses unitization without a KCC order and provides, in part, that unit operations can become effective without application to or order by the KCC where "all mineral and royalty owners and not less than 90% of the working interest owners approve, in writing, a contract for the unit operation of a pool or part thereof." K.S.A. 55-1317(b). Such a consensual unitization is likewise not statutorily conditioned upon the existence of any lease provision.

Perhaps the bottom line is that, if there is a complaint to be made that lessee abused its "right and power" under the lease, only

lessor should have standing to make that argument. After all, it was lessor that invested lessee with the right and power to unilaterally unitize, so only lessor should be able declare an abuse of power. Certainly, there is nothing in the language of the lease agreement that would preclude a lessor/property owner from acquiescing or stipulating to the existence of the lease conditions that permit unilateral unitization. Likewise, there is no contractual constraint on a lessor's ability to waive any irregularity in the lessee's exercise of its right and power to unitize under the lease agreement.

Moreover, as noted, there is no statutory or contractual impediment to a consensual unitization agreement between lessor and lessee. Here, the parties consented to, or at least acquiesced in, the unitization agreement and then performed under the agreement, enjoying their respective benefits of their bargain for a number of years. I have no problem holding that the parties' consensual performance of a legitimate unitization agreement was not invalidated by the terms of the oil and gas lease. Moreover, I can perceive of no way in which lessee, Thoroughbred, could obtain a remedy of any sort under the facts of this case. Consequently, I would find that the district court made the correct ruling in denying lessee's motion for summary judgment and granting summary judgment to lessor, Kansas City Royalty.

Although my decision is not driven by the ambiguity, or lack thereof, of the "conditions" language in the fourth paragraph of the lease, I disagree with the majority on that score as well. For instance, I cannot discern from the lease language who establishes the first condition—conformance with "regular spacing patterns." Under the second condition, the " 'spacing pattern . . . [is] established by State, Federal or other regulatory bodies.' " *Thoroughbred*, 297 Kan. at 1197. If the lease means that the regulators at KCC determine the spacing patterns for the first condition, why did the lease language fail to say so like it did for the second condition? If the KCC was meant to establish the regular spacing pattern for the first condition, as well as for the second condition, one might wonder what the fourth paragraph adds to lessee's ability to get a compulsory unitization order from the KCC under K.S.A. 55-1301 *et seq*. If the KCC is not the final word, does one determine

regular spacing based upon the particular mineral being produced, *i.e.*, gas only, oil only, or both gas and oil? Is there a different "regular spacing" for a horizontally drilled well that can span a mile or more underground? Moreover, the foregoing questions are germane to whether one should accept the affidavit of a KCC employee about what is required by law and regulation as being relevant to what constitutes a "regular spacing pattern" under the custom and practice of the trade. In sum, I would view summary judgment in favor of lessee to be improper under any circumstance.

LUCKERT, J., joins in the foregoing concurring and dissenting opinion.