Vizant Techs., LLC v. YRC Worldwide Inc., 2018 NCBC 63

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>15 CVS 20654 |
| MECKLENBURG COUNTY | |
| VIZANT TECHNOLOGIES, LLC,<br><br>              Plaintiff,<br><br>v.<br><br>YRC WORLDWIDE INC.,<br><br>              Defendant. | **ORDER AND OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE** |

1.     **THIS MATTER** is before the Court upon (i) Plaintiff Vizant Technologies, LLC's ("Vizant") Motion for Summary Judgment, (ii) Defendant YRC Worldwide Inc.'s ("YRC") Cross Motion for Summary Judgment, and (iii) YRC's Motion to Strike Certain Calculations and Opinions of Vizant's Damages Expert and Any Experts Who Rely on His Work (the "Motion to Strike") (collectively, the "Motions") in the above-captioned case.

2.     Having considered the Motions, the parties' briefs in support of and in opposition to the Motions, the arguments of counsel made at the May 23, 2018 hearing on these matters, and other appropriate matters of record, the Court concludes that Vizant's Motion for Summary Judgment should be **DENIED**, YRC's Cross Motion for Summary Judgment should be **DENIED**, and YRC's Motion to Strike should be **GRANTED**.

*Lincoln Derr PLLC, by Sara R. Lincoln and Kevin L. Pratt, for Plaintiff Vizant Technologies, LLC.*

*Strauch Green & Mistretta, P.C., by Jack M. Strauch and Jessie Charles Fontenot, for Defendant YRC Worldwide Inc.*

Bledsoe, Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

3.     This action arises out of an alleged breach of a Professional Services Agreement ("PSA") between Vizant and YRC.  Under the PSA, Vizant contracted to "perform an evaluation, assessment and customized analytical review" of the "Financial Payments" YRC receives and to "identify, indicate and quantify specific and actionable strategies and solutions" that would reduce YRC's costs associated with those payments.  (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 2 § 2 [hereinafter "PSA"], ECF No. 84.3.)  The PSA contemplated that YRC would provide certain specified information to Vizant and that Vizant would present its recommendations to YRC in a written report.  (PSA §§ 2, 13.)  In exchange for Vizant's services, YRC was to pay Vizant a percentage of YRC's savings associated with the strategies and solutions identified by Vizant.  (PSA § 10.)  Vizant alleges that YRC breached the PSA.  (Pl.'s Mem. L. Supp. Mot. Summ. J. 1, ECF No. 84.)

4.     When ruling on a motion for summary judgment, the Court does not make findings of fact, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue[.]" *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).  The following factual summary is uncontested.

A.  Factual Summary

5.  YRC is the parent company of several freight enterprises that operate throughout North America. (Def.'s Br. Supp. Mot. Summ. J. 3, ECF No. 88.) These subsidiaries include YRC Freight, USF Holland, USF Reddaway, and New Penn Motor Express. (Def.'s Br. Supp. Mot. Summ. J. 3.) A significant percentage of YRC's customers pay for shipping services by credit card. (Def.'s Br. Supp. Mot. Summ. J. 3.) With an annual operating revenue in the billions, (Pl.'s Mem. L. Supp. Mot. Summ. J. 1), YRC incurs millions of dollars in credit card processing costs each year, (Def.'s Br. Supp. Mot. Summ. J. 3). At all times relevant to this lawsuit, YRC has been looking for ways to reduce these costs. (Whitsel Dep. 29:8–23, ECF No. 96.)

6.  Vizant alleges that it is an out-of-state LLC with its principal place of business in Mecklenburg County, North Carolina. (Am. Compl. ¶ 1, ECF No. 23.) Vizant provides consulting services to help clients lower their payment processing costs. (Def.'s Br. Supp. Mot. Summ. J. 1.)

7.  On July 7, 2014, Bob Hughes ("Hughes"), a salesperson for Vizant, cold-called Todd Wilson ("Wilson"), director of revenue management for YRC, to discuss a possible services agreement between Vizant and YRC. (Wilson Dep. 83:5–16, ECF No. 95; Hughes Dep. 37:6–20, ECF No. 114.) Wilson recalls that, on their initial phone call, Hughes pitched the services agreement as a "pay-for-performance" deal. (Wilson Dep. 323–24.) Following the call, Hughes sent Wilson a follow-up email informing Wilson that Vizant had "patented technology" that would help YRC reduce its credit card costs. (July 7, 2014 Correspondence, ECF No. 133.)

8. Two days later, Hughes and another Vizant employee, Keith Gallagher, met with Wilson and another YRC employee, Scott Lopez. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 4, at 2, ECF No. 84.5.) At this meeting, Wilson told Hughes about the methods YRC already had in place to encourage its customers to switch from credit card payments to Automated Clearing House ("ACH") batch payments—a lower cost form of payment. (Lopez Aff. ¶5, ECF No. 101.) These methods included, among other things, charging customers a fee for credit card payments and offering incentives to switch from credit card to ACH. (Lopez Aff. ¶5.) As the meeting concluded, Vizant gave a draft of the PSA to YRC. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 4, at 3.)

9. On August 13, 2014, Wilson emailed Hughes requesting an electronic version of the draft PSA so that YRC could more easily evaluate the PSA's terms. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 4, at 2.) Hughes promptly sent Wilson a copy of the PSA in "redline form" for editing. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 4, at 1.) Two months later, YRC gave its initial PSA revisions to Vizant, requesting changes to client data terms as well as modifications to provisions concerning "information obligations, payment terms, billing term adjustments, confidentiality, choice of law, and warranties." (Pl.'s Mem. L. Supp. Mot. Summ. J. 3.) Vizant agreed to these changes. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 6, at 1, ECF No. 84.7.)

10. YRC also sought to broaden its ability to terminate the PSA, but Vizant rejected YRC's proposed changes to the PSA's termination clause. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 6, at 1.) Vizant explained that the language of the

termination clause was meant to protect against a client who might take Vizant's report, "terminate the [PSA] and implement the recommendations" without paying. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 6.) YRC agreed to keep the termination clause as drafted. (PSA § 24; Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 6.)

11. The parties executed the PSA on December 12, 2014. (PSA 5.) On February 18, 2015, YRC delivered to Vizant the financial data required by the PSA. (Campbell-Olson Email, ECF No. 125.)

12. On July 9, 2015, Hughes and Cindy Christiansen ("Christiansen"), another Vizant employee, delivered Vizant's report to YRC's offices in Overland Park, Kansas. (Lopez Aff. ¶ 7.) There, Christiansen presented an in-person summary of Vizant's recommendations to YRC personnel, including Wilson and Vice President of Cash Management Joe Whitsel. (Wilson Dep. 262:3–6, ECF No. 84.38; Christiansen Dep. 29:5–8, ECF No. 122; Hughes Dep. 113:23–114:7, ECF No. 84.36.) Vizant proposed five strategies for reducing YRC's payment costs:

(1) Apply cost recovery fees to all customer invoices and orders;
(2) Accelerate collection of YRC's accounts receivable;
(3) Promote payment cards to reduce bad debts;
(4) Shift commercial and purchasing card payments to Automated Clearing House (ACH) Network payments; and
(5) Negotiate more favorable card brand fees, interchange rates, and other financial incentives.

(Pl.'s Mem. L. Supp. Mot. Summ. J. 12.)

13. After less than fifteen minutes, Wilson stopped the presentation and reminded Christiansen that YRC already knew that it could charge a fee to recoup credit card costs. (Lopez Aff. ¶7.) When Wilson asked Christiansen if Vizant

intended to claim that it was entitled to a percentage of cost savings stemming from methods that YRC already knew about and had implemented, Christiansen replied, "Yes." (Wilson Dep. 264:15–21; Lopez Aff. ¶7.) Wilson then told Christiansen and Hughes to "pack up all of [their] stuff and get out." (Wilson Dep. 271:11–16.) Before leaving Overland Park, Hughes and Christiansen stopped at a FedEx store and mailed a hard copy of the report to YRC. (Christiansen Dep. 30–31.) The two also sent YRC an electronic copy of the report by email. (Christiansen Dep. 30–31.)

14. On September 22, 2015, YRC sent Vizant a written notice of termination. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 28, at 1, ECF No. 84.29.)

B. Procedural History

15. On November 10, 2015, Vizant filed a breach of contract claim against YRC, requesting declaratory and injunctive relief as well as damages for breach of the PSA.

16. On February 15, 2016, the case was designated a Complex Business Case under Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts and assigned to the undersigned.

17. After the close of discovery, on January 18, 2018, Vizant filed its Motion for Summary Judgment. The next day, YRC filed its Cross Motion for Summary Judgment and Motion to Strike.

18. On May 23, 2018, this Court held a hearing on the Motions, at which Vizant and YRC were represented by counsel. The Motions are ripe for resolution.

II.

CROSS MOTIONS FOR SUMMARY JUDGMENT

A.     Legal Standard

19.    Under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to . . . judgment as a matter of law." *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 353 (2009) (quoting N.C. R. Civ. P. 56(c)). A genuine issue is "one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472, 326 S.E.2d 632, 633 (1985).

20.    "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). "[O]nce the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). All

of the "[e]vidence presented by the parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003).

B.    Analysis

21.    Vizant moves for summary judgment on its breach of contract claim. Vizant argues that (1) the PSA indicates the parties' intent, (2) Vizant performed, and (3) YRC breached when it did not pay Vizant and withheld data from Vizant. Vizant contends that the PSA constitutes a complete and unambiguous manifestation of the parties' agreement because it was crafted after several months of negotiations and contains a merger clause and clear terms. According to Vizant, these unambiguous terms require YRC to pay Vizant for cost "reductions even if YRC terminates the contract and even if YRC previously considered implementing the identified cost reduction[s]." (Pl.'s Mem. L. Supp. Mot. Summ. J. 19.) YRC has not paid these fees and has stopped providing data to Vizant; thus, Vizant insists YRC has breached the PSA.

22.    YRC asserts an opposite, "unambiguous" reading of the PSA. Specifically, YRC counters that the PSA requires a causal relationship between Vizant's recommended strategies and the cost reductions YRC experienced during the PSA's term. Vizant is only owed a fee, YRC argues, if Vizant's suggestions actually caused YRC to change business practices and realize savings. YRC asserts that this did not occur, that therefore no fee is owed, and that, consequently, YRC has not breached the PSA.

23. "[W]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Here, the parties have expressly agreed that Kansas law controls "any controversy, dispute, or claim arising out of or relating to" the PSA. (PSA § 19.) Therefore, Kansas law controls the parties' agreement.

24. Under Kansas law, the interpretation of a contract is a question of law. *Carrothers Constr. Co. v. City of South Hutchinson*, 207 P.3d 231, 239 (Kan. 2009). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." *Id.* A contract should not be interpreted by "isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners." *City of Ark. City v. Bruton*, 166 P.3d 992, 1003 (Kan. 2007). The law favors reasonable interpretations of contractual provisions. *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013). "[R]esults which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." *Id.* "[E]xtrinsic evidence is only admissible if the four corners of the contract establish an ambiguity." *Thoroughbred Assocs., L.L.C. v. Kan. City Royalty Co., L.L.C.*, 308 P.3d 1238, 1248 (Kan. 2013). "Ambiguity exists if the contract contains provisions or language of doubtful or conflicting meaning." *Liggatt v. Emp'rs Mut. Cas. Co.*, 46 P.3d 1120, 1125

(Kan. 2002). Such ambiguity "does not appear until two or more meanings can be construed from the contract provisions." *Carrothers Constr. Co.*, 207 P.3d at 239.

25. Under the PSA, Vizant's fee was to be a percentage of the "Financial Payment Cost Reductions" YRC realized. (PSA § 10.) These "Financial Payment Cost Reductions" were calculated by comparing "Pre-Agreement Financial Payment Costs" to "Post-Agreement Financial Payment Costs." (PSA § 8.) If the "Pre-Agreement Financial Payment Costs" were greater than the "Post-Agreement Financial Payment Costs"—i.e., if YRC experienced a decrease in costs associated with financial payments—YRC was obligated to pay Vizant a percentage of the difference. (PSA § 8.) The PSA's definitions of "Pre-Agreement Financial Payment Costs" and "Post-Agreement Financial Payment Costs" are thus critically important to the determination of whether a payment obligation was triggered and whether YRC breached the PSA by failing to pay Vizant.

26. The PSA defined "Pre-Agreement Financial Payment Costs" as the financial payment costs that YRC incurred before entering the PSA. (PSA § 5.) "Post-Agreement Financial Payment Costs" were defined as the financial payment costs YRC incurred "as a result of the strategies and solutions that [were] identified and recommended by Vizant in performance of its professional services[.]" (PSA § 6.) The parties' arguments have largely centered on the interpretation of this second definition. According to Vizant, the Court should read the definition of Post-Agreement Financial Payment Costs to include costs saved as a result of strategies and solutions Vizant identified—i.e., those listed in Vizant's report or presentation—

regardless of whether Vizant actually caused YRC to implement the listed strategies and solutions. According to YRC, the Court should read the definition the opposite way, defining Post-Agreement Financial Payment Costs to include only those savings achieved "as a result of" Vizant recommending a strategy or solution.

27. Upon reviewing these definitions, the Court concludes that the meaning of Post-Agreement Financial Payment Costs largely depends on the meaning of the word "identified" within section 6 of the PSA. Costs deemed Post-Agreement Financial Payment Costs are those resulting from strategies and solutions "identified and recommended" by Vizant. (PSA § 6.) The meaning of "recommended" within the PSA is plain, but the meaning of "identified" is unclear.

28. The PSA does not contain a definition of "identify" or "identified." When a term is not defined within the four corners of a contract, Kansas courts will give the term its "plain, general, and common meaning in order to ensure the intentions of the parties are enforced." *Vanum Constr. Co. v. Magnum Block, L.L.C.*, 245 P.3d 1069, 1073 (Kan. Ct. App. 2010). Kansas courts may ascertain the common meaning of an undefined term by consulting secondary sources, including dictionaries. *See id.* at 1073–74. The Court now does the same.

29. When dealing with something as nebulous and conceptual as a business strategy, the word "identify" can take on multiple meanings. On one hand, the word could support Vizant's proposed interpretation of the PSA. To "identify" something can mean to "specify" that thing. *See Identify*, Black's Law Dictionary (10th ed. 2014). Under such a definition, Vizant's obligations under the PSA would merely amount to

the simple act of "recognizing" or "naming" a strategy or solution. *See Identify*, The New American Roget's College Thesaurus (rev. ed. 1985). Reading the PSA this way, if Vizant specified, recognized, or named a given strategy in its report that caused a reduction in YRC's credit card processing costs, Vizant would be entitled to its fee, regardless of whether YRC or Vizant caused the strategy to be implemented. This reading of the PSA is not absurd—businesses often hire consultants to pinpoint ongoing strategies that should be continued.

30. Alternately, "identify" could mean to "establish the . . . separate or distinct existence of." *Identify*, Merriam-Webster's Dictionary of Law (rev. ed. 2011). Under this definition, the meaning of "identify" could entail something beyond mere "naming"; it could require the more complex act of establishing something "independent" or "different." *See Separate*, Webster's Third New International Dictionary (1971). Under this reading of the PSA, Vizant would only be entitled to a fee if post-agreement costs[1] were lower than pre-agreement costs as the result of independent and different strategies identified by Vizant. This reading of the PSA is also reasonable.

31. Because the Court can construe two possible meanings to the term "identify," the Court concludes that the definition of Post-Agreement Financial Payment Costs contained within the PSA is ambiguous. *See Carrothers Constr. Co.*, 207 P.3d at 239. Consequently, the Court next turns to the question of whether the extrinsic evidence submitted by the parties presents a genuine issue of material fact

---

[1] The Court uses the term "post-agreement costs" to refer to those costs YRC incurred after executing the PSA.

as to the meaning of the disputed provisions of the PSA. *See Thoroughbred Assocs., L.L.C.*, 308 P.3d at 1248; *Ark. La. Gas Co., Div. of Arkla, Inc. v. Kansas*, 675 P.2d 369, 372 (Kan. 1984) ("A court may, in construing an ambiguous or indefinite contract, take into consideration the conduct of the parties as evidence of their interpretation of the document, provided that interpretation is not inconsistent with the language of the contract." (citing *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1304 (Kan. 1979))).

32.     Vizant points to the parties' negotiations concerning the PSA's terms as evidence of the parties' mutual agreement to a non-causal relationship between Vizant's recommendations and YRC's savings. As one example, the PSA's termination clause reads that, upon termination, YRC remains "obligated to pay the Services Fee to Vizant . . . if such Financial Payment Cost Reductions were identified by Vizant as part of its professional services and were realized by Client." (PSA § 24.) During negotiations, Vizant explained that the language in this clause, as worded, was important and protected Vizant from clients who would take Vizant's report, terminate the agreement, and implement Vizant's recommendations without paying Vizant. (Pl.'s Mem. L. Supp. Mot. Summ. J. Ex. 6.) Vizant notes that YRC agreed to the unaltered version of this provision and contends that this conduct during negotiations demonstrates an understanding between the parties that Vizant would not be required to prove that its services caused YRC to implement savings-achieving strategies. Vizant also notes that YRC and Vizant included references to certain, already-implemented credit card fee pricing structures under the definition of Pre-

Agreement Financial Payment Costs. (PSA § 5.) Had the parties meant for all savings achieved from existing YRC strategies to be exempt from the calculation of Vizant's fee, Vizant contends that they would have contracted for such in a similar manner.[2]

33. Conversely, YRC points to Vizant's marketing materials and in-person representations as conduct that evidences a mutual understanding of a causal relationship between Vizant's recommendations and YRC's savings. Vizant's marketing materials represent Vizant as a "results based," "pay-for-performance" company that "only generate[s] revenue" if it actually reduces a client's financial payment costs. (Vizant Marketing Materials 11, ECF No. 118.) The testimony of Vizant's and YRC's employees also supports YRC's understanding of the PSA's fee provisions. Vizant's David Askinas, the in-house lawyer that executed the PSA on Vizant's behalf, stated that he understood the compensation model within the PSA to be consistent with the Vizant's "pay-for-performance" marketing materials. (Askinas Dep. 47:19–24, ECF No. 121.) Hughes, the Vizant salesperson who initially pitched Vizant to YRC, testified that he represented to YRC that Vizant had to "actually do something . . . that caused YRC to save on incoming revenue costs." (Hughes Dep. 84:5–12.) Wilson, the YRC executive who received Vizant's sales pitch, testified that

---

[2] YRC asserts that it did not negotiate to include pre-existing credit card pricing in the terms of the PSA and that Vizant "unilaterally added this language to the contract on December 11, 2014." (Def.'s Br. Opp'n Pl.'s Mot. Summ. J. 14, ECF No. 171.) Under Kansas law, however, YRC had a duty to learn the contents of the PSA before signing, *Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991), and YRC signed the final version of the PSA containing the provision pointed to by Vizant. Determining which party added references to extant credit card pricing strategies into the contract does not allow the Court to conclusively infer the intent behind the disputed provisions of the PSA and is thus not dispositive.

he understood that YRC would only pay Vizant if Vizant delivered a strategy YRC "hadn't already thought of." (Wilson Dep. 324:6–10.)

34. Reviewing this extrinsic evidence, the Court concludes that a genuine issue of material fact remains. The evidence cited in the preceding paragraph is certainly evidence upon which a jury could reasonably find that YRC's interpretation of the PSA is correct. Nevertheless, the Court cannot conclude as much as a matter of law. Indeed, during negotiations of the PSA, Vizant was clear that language in the PSA's termination clause—which is similar to the "identified and recommended" language throughout the PSA—was necessary to avoid a situation in which a client took Vizant's ideas while contending that Vizant was owed nothing, i.e., the scenario Vizant alleges occurred here. The difficulty of proving that Vizant was the origin of the implemented, cost-saving strategy could plausibly cause Vizant to negotiate for, and the parties to adopt, a contract that required Vizant to be compensated for post-agreement savings that Vizant addressed in its recommendations, even if Vizant's recommendations simply confirmed the viability of strategies that YRC already had in place. Therefore, because the presented facts are "conflicting or admit[] of more than one inference," the Court concludes this issue cannot be resolved as a matter of law on summary judgment. *Dutta v. St. Francis Reg'l Med. Ctr.*, 850 P.2d 928, 937 (Kan. Ct. App. 1993).

35. Furthermore, even if YRC's reading of the PSA is correct and the contract requires a causal connection between Vizant's identified strategies and YRC's savings, an issue of fact remains as to whether YRC actually implemented the

strategies in Vizant's report. YRC submitted assurances that it has not viewed Vizant's report and thus could not have knowingly implemented any strategies recommended by Vizant.[3] (Turner Aff. ¶4, ECF No. 129; Wilson Dep. 335:13–21.) Vizant presents circumstantial evidence to dispute this. Particularly, Vizant notes that "in the year preceding the PSA's execution, there was little month-to-month change in customers using payment cards versus those using ACH," (Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Summ. J. 9, ECF No. 177.), but that credit card payments declined by nearly 25% the year after Vizant delivered its report to YRC. (Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Summ. J. Ex. 2.) The suggested inference is that YRC used the strategies recommended in Vizant's report to achieve this increase in savings. While circumstantial, the Court concludes that this evidence creates an additional issue of fact that precludes the Court from entering summary judgment.

36. The Court draws similar conclusions as to Vizant's argument that YRC has breached the PSA by refusing to provide any further financial information to Vizant following the termination of the PSA. Section 24 of the PSA required YRC to continue to provide Vizant with "the data and information required under Section 13" of the PSA following any termination by YRC. (PSA § 24.) At oral argument, YRC conceded that, following its termination of the PSA, YRC did not provide Vizant with further financial data until discovery in this lawsuit. Though this would appear to answer

---

[3] Pursuant to an order of this Court, Todd Wilson viewed an electronic copy of Vizant's report in early 2017 for purposes of assisting the parties with discovery. YRC contends that this is the only instance in which any person associated with YRC has viewed Vizant's report.

this issue in Vizant's favor, the specific language of the PSA does not permit such an easy resolution.

37. Section 24 of the PSA states that in the event of termination by YRC, YRC was to "continue to be obligated to provide all of the data and information required under Section 13[.]" (PSA § 24.) Section 24 does not, however, impose a time limit for this obligation. The section references only the time period for which YRC will be required to pay service fees to Vizant—thirty-six months or the remainder of the "Billing Term." (PSA § 24.) The only limit on the scope of YRC's obligation to provide data comes from section 13, which begins by stating that YRC shall "provide all of the data and information necessary for Vizant to perform its professional services under [the PSA]" and lists the kinds of data YRC is required to provide. (PSA § 13.)

38. Reading section 24 and the first sentence of section 13 together produces a confusing result. Section 24 provides that in the event YRC elected to terminate the PSA, YRC would be obligated to continue providing the data required by section 13. The data required by section 13, however, was that information necessary for Vizant to perform Vizant's professional services. But if YRC terminated the PSA, Vizant would no longer be performing its professional services, and thus Vizant would seemingly have no further need for YRC's data. Thus, section 24's requirement that YRC continue producing data post-termination appears to impose no actual obligation on YRC.

39. Focusing on the second paragraph of section 13 compels a different conclusion. The second sentence of this paragraph reads, "For Vizant to perform its

ongoing monthly services, the data and information listed herein shall be provided to Vizant within 7 days, or as soon as available of its [sic] request by Vizant," and a list of data follows. (PSA § 13.) Treating this provision of section 13 as the prominent thrust of YRC's obligations following termination, section 24 could be read as requiring YRC to continue to provide Vizant with the kinds of data and information listed in section 13. This reading produces a more coherent result, but it does not provide a duration for which YRC's data-related obligations would continue.[4]

40. Thus, under either reading of the PSA's termination clause, it is unclear what data-related obligations the parties intended to impose on YRC post-termination. The extrinsic evidence contained in the record does not resolve the ambiguity. Thus, here too, questions concerning the PSA's meaning and YRC's alleged breach cannot be decided as a matter of law on summary judgment. *See Dutta*, 850 P.2d at 937 (affirming trial court's decision to put factual issues concerning the meaning of an ambiguous contract clause and whether a party breached that clause to the jury).

41. This dispute is rife with uncertainty. Key provisions of the PSA between Vizant and YRC are ambiguous, and the presented extrinsic evidence does not definitively resolve questions concerning the parties' intent. Therefore, because

---

[4] Section 12 of the PSA does provide that the "Agreement Term" of the PSA would commence on the "Effective Date" and end "with the conclusion of the Billing Term." (PSA § 12.) Section 12 does not, however, mention the effect termination has on the Agreement Term or the parties' obligations. Further, neither sections 13 nor 24 tie YRC's data-related obligations upon termination to the "Agreement Term," with the latter section only stating that YRC's obligation to continue paying the "Services Fee" would continue for the lesser of thirty-six months "or the remaining Billing Term of the Agreement." (PSA § 24.)

neither party can show that no genuine issue of material fact exists with regard to YRC's obligations under the PSA, the extrinsic evidence used to interpret the agreement's ambiguity, and the actual effects of Vizant's recommendations, the Court denies both Motions for Summary Judgment.[5]

### III.

### MOTION TO STRIKE

42.     YRC's Motion to Strike asks the Court to exclude certain opinions and calculations offered by Vizant's damages expert, Scott Emmanuel ("Emmanuel"). Emmanuel's report calculates fees Vizant is allegedly owed from two of Vizant's recommendations to YRC.

43.     The first recommendation Emmanuel evaluated involved charging an account management fee for credit card transactions.  YRC notes that it believes Emmanuel performed his calculations on this recommendation for more months than proper under the PSA but "does not object to the simple arithmetic of adding up the [credit card fee] charges and annualizing them."  (Def.'s Br. Supp. Mot. Strike 3, ECF No. 90.)

---

[5] YRC also argues that, even if Vizant's interpretation of the contract is correct, or in the event the language is held to be ambiguous, the Court should hold that Vizant is equitably estopped from seeking fees due to Vizant's misrepresentations about its services prior to the execution of the PSA.  Under Kansas law, "equitable estoppel generally involves questions of fact and when the facts are disputed or when necessary facts come from ambiguous documents, summary judgment is inappropriate and the factual dispute must await resolution at trial." *Dunn v. Dunn*, 281 P.3d 540, 554 (Kan. Ct. App. 2012).  Due to the Court's inability to decide the above issues at summary judgment, the Court cannot conclude that YRC's equitable estoppel defense defeats Vizant's breach of contract claim as a matter of law. The same is true of YRC's contention that the PSA is void for unconscionability as a matter of law.

44.    YRC's Motion to Strike instead focuses on the second recommendation on which Emmanuel purports to calculate damages—Vizant's recommendation that YRC convince its clients to switch to ACH payments.  YRC objects to Emmanuel's damages calculation for this recommendation by arguing that Emmanuel failed to distinguish specific causes of cost reductions from overall trends and that his opinions rest on broad, speculative assumptions.

A.    Legal Standard

45.    Expert testimony is governed by North Carolina Rule of Evidence 702, which "incorporates the standard from the *Daubert* line of [federal] cases" concerning the admissibility of expert testimony.  *State v. McGrady*, 368 N.C. 880, 888, 787 S.E.2d 1, 8 (2016).  For expert testimony to be admissible, (1) the expert testimony must be based on specialized knowledge that will "assist the trier of fact," (2) the expert must be qualified by "knowledge, skill, experience, training, or education," and (3) the testimony must be reliable.  N.C. R. Evid. 702(a); *McGrady*, 368 N.C. at 889–90, 787 S.E.2d at 8–9.

46.    An expert's testimony is reliable if "(1) the testimony is based on sufficient facts or data[,] (2) the testimony is the product of reliable principles and methods," and "(3) the witness has applied the principles and methods reliably to the facts of the case."  N.C. R. Evid. 702(a).  The focus must be on the "principles and methodology" the expert employs, "not on the conclusions that [the expert] generate[s]."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993).  The trial court makes the initial assessment of the admissibility of the expert opinion and has

discretion over how to consider the three prongs of the reliability test. *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9. In assessing an expert's reliability, North Carolina courts may consult federal case law. *Id.* at 888, 787 S.E.2d at 8. A trial court's decision as to whether an expert's testimony meets Rule 702(a)'s requirements "will not be reversed on appeal absent a showing of abuse of discretion." *Id.* at 893, 787 S.E.2d at 11 (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004)).

B.      Analysis

47.     YRC argues that Emmanuel's damages calculation on Vizant's ACH recommendation is "highly problematic," (Def.'s Br. Supp. Mot. Strike 4), because, among other things, Emmanuel did not (1) attempt to distinguish between cost reductions resulting from YRC convincing customers to switch to ACH and reductions resulting from numerous other reasons YRC's credit card costs might decline or (2) account for the costs of financial incentives YRC implemented to convince customers to switch to ACH payments, such as rebates, when attempting to calculate the post-agreement savings YRC enjoyed due to Vizant's identified strategies. As a result, YRC characterizes Emmanuel's damages calculation regarding Vizant's recommendation that YRC convince its clients to switch to ACH payments as founded on nothing but speculation and argues that the Court should exclude Emmanuel's opinion under Rule 702(a).

48.     Vizant responds to YRC's Motion to Strike by arguing that Emmanuel's methodology is valid because he applied the "agreed-to formula" found within the

PSA. Vizant notes that the contract requires a comparison of YRC's "Pre-Agreement Financial Payment Costs" to YRC's "Post-Agreement Financial Payment Costs," and if the "Post-Agreement Financial Payment Costs" are lower, Vizant is "entitled to a specified percentage of those reductions." (Pl.'s Resp. Opp'n Def.'s Mot. Strike 9, ECF No. 182.) Vizant believes Emmanuel's opinion tracks the required calculations under the PSA and argues that the opinion is thus proper. This argument, however, does not deal with the issue YRC raises.

49. Vizant's fee was to be a percentage of "Financial Payment Cost Reductions." (PSA § 10.) These "Financial Payment Cost Reductions" result from a comparison of "Pre-Agreement Financial Payment Costs" to "Post-Agreement Financial Payment Costs." (PSA § 8.) As noted above, "Post-Agreement Financial Payment Costs" are not defined as broad, kitchen-sink savings realized after the execution of the PSA, as Vizant contends in this context. Instead, "Post-Agreement Financial Payment Costs" are expressly defined as those savings that specifically resulted from the strategies and solutions identified by Vizant. (PSA § 6.)

50. Thus, in order to determine this difference in savings, one has to know which reductions in post-agreement costs occurred "as a result of" the strategies identified by Vizant. YRC's objection is not that Emmanuel failed to follow the formula for damages set out in the PSA, but rather that Emmanuel plugged incorrect and speculative variables into the formula because he did not attempt to determine which cost reductions were attributable to the strategies Vizant identified. After reviewing

Emmanuel's deposition testimony and the other evidence enumerated by both parties in briefing and at oral argument, the Court concludes that YRC is correct.

51. The problematic assumptions Emmanuel made when calculating Vizant's damages are best summarized by his own deposition testimony. When Emmanuel was questioned by YRC's counsel about whether Emmanuel's calculation of YRC's ACH-related savings took into account the costs of incentives YRC had to offer customers to switch to ACH, Emmanuel confirmed his calculation did not while acknowledging that it should have:

> Q: In order to calculate how much YRC saved by customers moving from credit card to ACH, you certainly ought to account for the amount that YRC paid its customers in incentives to make that move from credit card to ACH, right?
>
> A: Correct.
>
> Q: And you have not done that, have you?
>
> A: Correct.

(Emmanuel Dep. 123:24–124:6, ECF No. 90.10.)

52. Even more troubling, however, are the assumptions Emmanuel admits he made when he attempted to discern what reductions in YRC's post-agreement credit card costs were attributable to YRC's customers switching from credit card to ACH payments—a step that would have been vital in determining which costs constituted Post-Agreement Financial Payment Costs for purposes of calculating Vizant's fee under Vizant's theory of the case. By his own admission, Emmanuel assumed that all reductions in YRC's credit-card-associated costs following the PSA's execution

were attributable to YRC's customers switching to ACH payments, despite acknowledging that he had no basis to make such an assumption:

Q: And you have no idea whether or not what you say was a drop in Visa, MasterCard or Discover payments had anything to do with YRC encouraging a customer to pay by ACH instead of using one of those credit cards, right?

A: Correct.

Q: You have no idea whether those were the simple result of market forces where customers change their own . . . payment type or leave and go to a different trucking company, right?

. . . .

A: Correct.

. . . .

Q: You don't know whether that reduction . . . was caused by things you and I can't even understand, right?

A: Correct.

Q: And you don't know whether that reduction was caused by YRC implementing some recommendation that Vizant put in its report, right?

A: Correct.

Q: All you know is that your math tells you that there was some reduction, and who in the world knows why it happened, right?

A: Correct.

(Emmanuel Dep. 111:14–112:1, 137:1–11.)

53. Under Emmanuel's calculation, as described by his own testimony, true savings caused by YRC's customers switching to ACH payments and other factors leading to a reduction in customers paying with credit cards—for example, a reduction in credit card payments due to lost business—would all have been counted

as savings for which YRC owed Vizant a fee. As YRC states, Emmanuel assumed "every single dollar of [post-agreement cost reductions] was due solely and completely to YRC having convinced customers to pay by ACH[.]" (Def.'s Br. Supp. Mot. Strike 5.) This calculation (i) does not abide by the formula in the PSA, which requires a comparison of pre-agreement costs to post-agreement costs resulting from strategies identified by Vizant, (ii) rests on unjustifiable assumptions, and (iii) could mislead a jury into awarding Vizant damages for what was in reality a loss in YRC's business.

54. "A conclusion that an expert opinion rests on a faulty premise is essentially a finding that the opinion is unreliable under Rule 702(a)," *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2016 NCBC LEXIS 100, at *9 (N.C. Super. Ct. Dec. 16, 2016), and an expert's failure to "adequately account[] for obvious alternative explanations" may provide a trial court with grounds for excluding opinion testimony, *McGrady*, 368 N.C. at 891, 787 S.E.2d at 10; *see also MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297, 307 (4th Cir. 2013) (holding an expert opinion that "ignored business realities and relied on sheer speculation" inadmissible under Federal Rule of Evidence 702); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 143–44 (4th Cir. 1994) (holding it was an abuse of discretion to admit an expert's damages opinion that was based on unsupported assumptions).

55. The Court concludes that Emmanuel's opinion on damages related to YRC's customers switching to ACH payments is unreliable. The proffered opinion fails to consider or account for alternative causes for cost reductions, contains analytical gaps, ignores key direct costs, and eschews the formula agreed upon in the PSA. The

Court thus concludes that Emmanuel's opinion on this topic is based on insufficient data, employs an unreliable method, and does not reliably apply Emmanuel's chosen method to the facts of this case. Accordingly, the Court concludes that YRC's Motion to Strike should be granted.[6]

IV.

CONCLUSION

56. For the foregoing reasons, the Court hereby **ORDERS** as follows:

    a. The Court **DENIES** Plaintiff's Motion for Summary Judgment with regard to Plaintiff's breach of contract claim.

    b. The Court **DENIES** Defendant's Cross Motion for Summary Judgment with regard to Plaintiff's breach of contract claim.

    c. The Court **GRANTS** Defendant's Motion to Strike. Emmanuel will not be permitted to offer testimony or opinions relating to his damages calculations concerning Vizant's recommendation that YRC convince its clients to switch to ACH payments. Similarly, no expert witness shall be permitted to give testimony that is dependent upon

---

[6] Vizant also argues that the Court should deny YRC's Motion to Strike because YRC failed to comply with Rule 7.3 of the General Rules of Practice and Procedure for the North Carolina Business Court ("BCRs") by filing the Motion to Strike without consulting Vizant for Vizant's position on the motion. Given the particular circumstances presented by the cross-motions for summary judgment and the Motion to Strike, and the certainty that Vizant would not have consented to the Motion to Strike, the Court will, in the exercise of its discretion, excuse YRC's technical violation of BCR 7.3. The Court notes, however, that it expects the parties' strict compliance with the rules of this Court hereafter and does not intend the Court's decision in this instance to offer sanctuary to future litigants who fail to comply with the consultation requirement of BCR 7.3.

Emmanuel's calculations concerning Vizant's recommendation that YRC convince its clients to switch to ACH payments.

d. The Court will notice a status conference by separate order for the purpose of setting a pretrial and trial calendar.

**SO ORDERED**, this the 26th day of June, 2018.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases